**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**KEVIN TORGERSON,**

        **Plaintiff,**

**v.**                            **1:21-cv-00204-DHU-LF**

**CHRISTOPHER STARR,**

        **Defendant.**

**DEFENDANT STARR'S MOTION FOR SUMMARY JUDGMENT BASED IN PART ON
QUALIFIED IMMUNITY AND MEMORANDUM IN SUPPORT**

COMES NOW, Defendant Starr, by and through his counsel of record, the Law Office of Jonlyn M. Martinez, LLC, hereby submits his Motion for Summary Judgment and Memorandum in Support.

Counsel for the Plaintiff was contacted for his position concerning this Motion and it is opposed.

**INTRODUCTION**

The Plaintiff's Complaint contains the following Counts:

I: 42 U.S.C. § 1983 Violation of the 4th and 14th Amendments (Unreasonable Seizure and Excessive for);

II: 42 U.S.C. § 1983 Violation of the 4th and 14th Amendments (Failure to Warn Before Using Deadly Force);

III: 42 U.S.C. § 1983 Violation of the 4th and 14th Amendments (Use of Force on Subdued Person); and

IV: Claims Under the New Mexico Tort Claims Act NMSA 1978 § 41-4-12.

In the present case, the Plaintiff was involved in a single car accident near Carnuel, New Mexico at State Road 333 near Mile Marker 2. ***See photograph of Plaintiff's car***, attached hereto as Exhibit A.[1] The Plaintiff left the scene of the accident and began traveling on foot along I-40. The Bernalillo County Sheriff's Office received calls concerning Plaintiff walking along I-40, and dispatched deputies to his reported location. ***See Deposition of Volk***, at p. 8, lines 2-7, attached hereto as Exhibit C. As Deputy Volk approached New Mexico 333 near Herrera Road, he saw a subject wearing dark clothes walking on Herrera Road. ***Id***., at p. 10, lines 18-20. The Plaintiff appeared agitated and did not appear to want to interact with law enforcement. ***Id***., at p. 18, lines 11-25. Deputy Volk spoke to the Plaintiff for a moment, the Plaintiff then walked away and jumped over a fence and continued to walk away from Deputy Volk. ***Id***., at p. 27, lines 7-11. Deputy Volk then attempted to speak to the Plaintiff over the loud-speaker of his vehicle. ***Id***., at p. 28, lines 11-16. The Plaintiff then walked back towards Deputy Volk and jumped back over the fence. ***Id***., at p. 32, lines 1-4. Once the Plaintiff landed, he took a bladed stance and had a firearm in his left hand. ***Id***., at p. 36, lines 13-21. Deputy Volk drew his firearm and pointed it at the Plaintiff.  ***Id***., at p. 37, lines 5-18. Although the Plaintiff placed his firearm in his waistband, he refused to follow Deputy Volk's command and instead jumped back over the fence and walked away from Deputy Volk. ***Id***., at p. 44, lines 10-15. Deputy Volk transmitted his interaction with the Plaintiff over the radio, including the fact that the Plaintiff was in possession of a firearm. ***Id***., at p. 42, lines 1-4. Deputy Barker responded to Deputy Volk's location and he observed the Plaintiff walking away from Deputy Volk. ***See Deposition of Barker***, at p. 20, lines

---

[1] A pipe and methamphetamines were later discovered in the Plaintiff's vehicle. ***See photo of pipe and methamphetamines located within Plaintiff's car***, attached hereto as Exhibit B.

12-15, attached hereto as Exhibit D. Deputy Barker knew that Plaintiff was walking towards another deputy, Deputy Rivas. ***See Exhibit D***, at p. 31, lines 13-24. Deputy Barker left Deputy Volk's location and headed to the area where Deputy Rivas was located. ***Id.*** Shortly after Deputy Barker arrived at Deputy Rivas' location, Deputy Heredia also arrived at this location. The deputies attempted to speak to the Plaintiff. ***Id.***, at p. 35, lines 5-6, ***and see audio recording of Deputy Heredia***, attached hereto as Exhibit E. They could see the Plaintiff's firearm in the right side of the waistband of his pants. ***See Exhibit D***, at p. 38, lines 1-4. Deputy Barker and Heredia had their firearms pointed at the Plaintiff and Deputy Rivas had his rifle pointed at the Plaintiff or in the low ready position. ***Id.***, at p.46, lines 15-18. Throughout the deputies' interaction with the Plaintiff, he refused to comply with their requests that he place his hands on his head and permit them to obtain his firearm. ***Id.***, at p.54, lines 5-22 and ***see Exhibit E*** at 26:30 – 28:10.

Defendant Starr, the deputies' supervisor arrived at the Plaintiff's location. ***See Deposition of Starr***, at p. 38, lines 6-9, attached hereto as Exhibit F. Realizing that the Plaintiff was not cooperating with the deputies' instructions, and was in possession of a firearm, he retrieved his rifle from his trunk and positioned himself so that he could cover the deputies interacting with the Plaintiff. ***Id.***, at p.45, line 7 to p. 48, lines 7. He was required to move several times as the Plaintiff moved his location. ***Id.***, at p. 75, lines 24 through, p. 76, line 2. Over the radio, Defendant Starr instructed the deputies to offer the Plaintiff cigarettes and water in an attempt to deescalate the situation. ***Id.***, at p. 63, lines 8-10. Despite the deputies' efforts to offer the Plaintiff assistance and to secure his firearm, the Plaintiff refused to comply. ***Id.***, at p. 85, lines 13-17. More than thirty (30) minutes elapsed as the deputies attempted to gain the Plaintiff's compliance. ***See Exhibit E***. At one point, it appeared that the Plaintiff was going to

3

comply with the deputies' instructions, however, at that point the deputies can be heard telling him to get his hands out of his pockets and to keep them away from his gun. ***See Deposition of Heredia***, at p. 21, lines 25 through p. 22, lines 1-3, attached hereto as Exhibit G, ***and see Exhibit E***, at 26:55-29:05. Deputy Barker saw the Plaintiff's right hand disappear from view as he reached towards his gun. ***See Exhibit D***, at p. 56, lines 3-10. Sergeant Starr testified that he saw the Plaintiff take a bladed stance as he reached for his gun. ***See Exhibit F***, at p. 83, lines 23-25. Sergeant Starr fired two rounds from his rifle, striking the Plaintiff in the right hand, then into his right hip where his firearm was located. ***See Deposition of Plaintiff***, at p. 197, lines 12 to 18, attached hereto as Exhibit H.  The second bullet hit the Plaintiff in the left side of his back into his left arm. ***See Deposition of Torgerson video clip***, attached hereto as Exhibit I. Deputy Heredia believed the Plaintiff shot himself after she saw him reach towards his gun. ***See Exhibit G***, at p. 22, lines 17-20 The Plaintiff was interviewed by law enforcement while he was in the hospital. During this interview, the Plaintiff was read his ***Miranda*** rights. ***See Audio of Torgerson Hospital Interview***, at 0:48-1:23, attached hereto as Exhibit J recording. During this interview, the Plaintiff admitted that he reached for his firearm and indicated that he appeared aggressive, causing them to shoot him. ***Id***., at 10:25-11:14.

## UNDISPUTED MATERIAL FACTS

1. On or about March 3, 2020, the Plaintiff was involved in a single car accident near Carnuel, New Mexico at State Road 333 near Mile Marker 2. ***See Deposition of the Plaintiff***, at p. 68, lines 7-17, attached hereto as Exhibit H.

2. The Plaintiff left the scene of the accident and began traveling on foot along I-40. ***Id***., at p. 163, lines 6-9.

3. The Bernalillo County Sheriff's Office received calls concerning Plaintiff walking along I-40, and dispatched deputies to his reported location. ***See Deposition of Volk***, at p. 8, lines 2-7, attached hereto as Exhibit C, ***and see Plaintiff's Complaint***, at ¶ 7 [Document No. 1-2].

4. As Deputy Volk approached New Mexico 333 near Herrera Road, he saw the Plaintiff. ***Id***., at p. 10, lines 18-20, ***and see Plaintiff's Complaint***, at ¶ 10 [Document No. 1-2].

5. The Plaintiff appeared agitated and did not appear to interact with law enforcement. ***Id***., at p. 18, lines 11-25.

6. Deputy Volk spoke to the Plaintiff for a moment, the Plaintiff then walked away and jumped over a fence and continued to walk away from Deputy Volk. ***Id***., at p. 27, lines 7-11, ***and see Plaintiff's Complaint***, at ¶ 11 [Document No. 1-2].

7. Deputy Volk then attempted to speak to the Plaintiff. ***Id***., at p. 28, lines 11-16. The Plaintiff then walked back towards Deputy Volk and jumped back over the fence. ***Id***., at p. 32, lines 1-4. Once the Plaintiff landed, Deputy Volk noticed that he had a firearm in his left hand. ***Id***., at p. 36, lines 13-21.

8. Deputy Volk drew his firearm and pointed it at the Plaintiff. ***Id***., at p. 37, lines 5-18 While the Plaintiff placed his firearm in his waistband, he refused to follow Deputy Volk's command and instead jumped back over the fence and walked away from Deputy Volk. ***Id***., at p. 44, lines10-15, ***and see Plaintiff's Complaint***, at ¶ 11 [Document No. 1-2].

9. Deputy Volk transmitted his interaction with the Plaintiff over the radio, including the fact that the Plaintiff was in possession of a firearm. ***Id***., at p. 42, lines 1-4.

10. Deputy Barker responded to Deputy Volk's location, and he observed the Plaintiff walking away from Deputy Volk. ***See Deposition of Barker***, at p. 20, lines 12-15, attached hereto as Exhibit D.

11. Deputy Barker knew that Plaintiff was walking towards another deputy, Deputy Rivas. *See Exhibit D*, at p. 31, lines 13-24.

12. Deputy Barker left Deputy Volk's location and headed to the area where Deputy Rivas was located. *Id*. Shortly after Deputy Barker arrived at Deputy Rivas' location, Deputy Heredia also arrived at this location. *See Deposition of Heredia*, at p. 8, line 23 to p. 9, line 1, attached hereto as Exhibit G.

13. The deputies attempted to speak to the Plaintiff. *Id*., at p. 35, lines 5-6, *and see audio recording of Deputy Heredia*, attached hereto as Exhibit E.

14. The deputies could see the Plaintiff's firearm in the right side of the waistband of his pants. *See Exhibit D*, at p.38, lines 1-4, *and see Plaintiff's Complaint*, at ¶ 15 [Document No. 1-2].

15. Deputy Barker and Heredia had their firearms pointed at the Plaintiff and Deputy Rivas had his rifle pointed at the Plaintiff or in the low ready position. *Id*., at p. 46, lines 15-18.

16. Throughout the deputies' interaction with the Plaintiff, he refused to comply with their requests that he place his hands on his head and permit them to obtain his firearm. *See Exhibit D*, at p. 54, lines 5-22 and *see generally Exhibit E*.

17. Defendant Starr, the deputies' sergeant, arrived at the Plaintiff's location. *See Deposition of Starr*, at p. 38, lines 6-9, attached hereto as Exhibit F.

18. Defendant Starr observed that the Plaintiff was not cooperating with the deputies' instructions, and was in possession of a firearm, he retrieved his rifle from his trunk and positioned himself so that he could cover the deputies interacting with the Plaintiff. *Id*., at p. 45, line 7 to p. 48, line 7.

19. Sergeant Starr was required to move several times as the Plaintiff moved his location during his interaction with the deputies. *Id*., at p. 75, line 24 through, p. 76, lines 2

20. Over the radio, Defendant Starr instructed the deputies to offer the Plaintiff cigarettes and water in an attempt to deescalate the situation. *Id*., at p. 63, lines 8-10, *and see Exhibit E*, at 7:42 – 7:50.

21. Despite the deputies' efforts to offer the Plaintiff assistance and to secure his firearm, the Plaintiff refused to comply. *Id*., at p. 85, lines 13-17, and *see generally Exhibit E.*

22. More than (30) minutes elapsed as the deputies attempted to gain the Plaintiff's compliance. *See Exhibit E, and see Plaintiff's Complaint*, at ¶ 14 [Document No. 1-2].

23. At one point, it appeared that the Plaintiff was going to comply with the deputies' instructions, however, at that point the deputies can be heard telling him to get his hands out of his pockets and to keep them away from his gun. *See Deposition of Heredia*, at p.21, lines 25 through p. 22, lines 1-3, attached hereto as Exhibit G and *see Exhibit E* at 26:55-29:05.

24. Deputy Barker saw the Plaintiff's right hand move towards his gun. *See Exhibit D*, at p.56, lines 3-10, *and see* p. 69, lines 3-13.

25. Sergeant Starr observed the Plaintiff reach for his for his gun. *See Exhibit F*, at p. 93, lines 20-24. From his position, Sergeant Starr observed the Plaintiff to be within 10 or more feet from the deputies. *See Deposition of Starr*, at p. 76, line 21 to p. 77, line 7, attached hereto as Exhibit F.

26. Sergeant Starr fired two rounds from his rifle, striking the Plaintiff in the right hand, then into his right hip where his firearm was located. *See Deposition of Plaintiff*, at p. 197, lines 12 to 18, and p. 199, lines 12-15, attached hereto as Exhibit H, and see photos of Plaintiff's injury to his right hand and his right hip. *See stills from Plaintiff's Videotaped Deposition*,

attached hereto as Exhibits L (wrist) and M (hip). The second bullet hit the Plaintiff in the left side of his back into his left arm. ***See Deposition of Torgerson video clip***, attached hereto as Exhibit I.

27. Deputy Heredia believed the Plaintiff shot himself after she saw him reach towards his gun. ***See Exhibit G***, at p. 22, lines 17-20.

28. The Plaintiff was interviewed by law enforcement while he was in the hospital. After he was given his ***Miranda*** warnings, he voluntarily spoke to law enforcement. ***See Audio Recording of Torgerson Hospital Interview***, at 0:48-1:23, attached hereto as Exhibit J, ***and see Transcript of Recording***, at Torgerson 418, attached hereto as Exhibit K. During this interview, the Plaintiff admitted that he reached for his firearm and indicated that he understood that "it was probably aggressive looking." ***Exhibit J***, at 10:25-11:14, ***and see Exhibit K***, at Torgerson 423-424.

## POINTS AND AUTHORITIES

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." ***E.E.O.C. v. Horizon/CMS Healthcare Corp.***, 220 F.3d 1184, 1190 (10th Cir. 2000) (citation omitted); ***accord Tabor v. Hilti, Inc***., 703 F.3d 1206, 1215 (10th Cir. 2013). In applying this standard, the Court views the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party. ***Schaffer v. Salt Lake City Corp.***, 814 F.3d 1151, 1155 (10th Cir. 2016) (quoting ***Twigg v. Hawker Beechcraft Corp.***, 659 F.3d 987, 997 (10th Cir. 2011)). "At the

8

summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." ***Scott v. Harris***, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007), (emphasis added).

However, the general proposition that we accept plaintiff's version of the facts in the qualified-immunity summary-judgment setting is not true to the extent that there is *clear contrary* evidence of the incident at issue. ***Thomas v. Durastanti***, 607 F.3d 655, 659 (10th Cir. 2010) (emphasis added); *see* ***Emmett v. Armstrong***, 973 F.3d 1127, 1131 (10th Cir. 2020)(noting the appropriateness of relying on video evidence that clearly contradicts plaintiff's "story"). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. ***Scott***, 550 U.S. at 380 (emphasis added). In the present case, an audio recording exists which documents the Plaintiff's behavior and his statements concerning his behavior. These recordings belie the Plaintiff's allegations in this matter and demonstrate that summary judgment in favor of the Defendant is appropriate.

**I. Defendant Starr is Entitled to Qualified Immunity**.

The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ***Pearson* v. *Callahan***, 555 U. S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). As the United States Supreme Court has explained, qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" ***District of Columbia* v. *Wesby***, 583 U. S. ___, ___ -___, 138 S. Ct. 577, 199 L. Ed. 2d 453, 456 (2018) (quoting ***Malley* v. *Briggs***, 475 U. S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

The United States Supreme Court has repeatedly told courts not to define clearly established law at too high a level of generality. See, *e.g.*, *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 583 U. S., at ___, 138 S. Ct. 577, 199 L. Ed. 2d 453, at 467 (quoting *Saucier* v. *Katz*, 533 U. S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). Such specificity is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix* v. *Luna*, 577 U. S. 7, 12, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) (*per curiam*) (internal quotation marks omitted).

*City of Tahlequah v. Bond*, 142 S. Ct. 9, 11-12 (2021). A defendant's assertion of qualified immunity from suit under 42 U.S.C. § 1983 results in a presumption of immunity. *Est. of Smart ex rel. Smart v. City of Wichita ("Smart")*, 951 F.3d 1161, 1168 (10th Cir. 2020). A plaintiff "can overcome this presumption only by 'show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that "every reasonable official would have understood," that such conduct constituted a violation of that right.'" *Reavis ex rel. Est. of Coale v. Frost ("Reavis")*, 967 F.3d 978, 984 (10th Cir. 2020) (alteration in original) (quoting *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)). "The plaintiff must satisfy both prongs to overcome a qualified immunity defense, and we may exercise our discretion as to which prong to address first." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)(noting that "[c]ourts have discretion to decide the order in which to engage the[] two prongs" of the qualified-immunity standard).

A.   **Defendant Starr Is Entitled to Qualified Immunity with Regard to Count I, Violation of the 4th and 14th Amendments (Unreasonable Seizure and Excessive Force).**

This case is similar to *Estate of Taylor v. Salt Lake City*, No. 19-4085, 2021 U.S. App. LEXIS 32046, at *2-3 (10th Cir. Oct. 26, 2021), in which two law enforcement officers followed

up on a 911 call reporting that a man had flashed a gun. The caller described the man and noted

that he was accompanied by another male whom the caller also described. The officers attempted

to stop Mr. Taylor and two male companions because two of the three men matched the caller's

descriptions. While Mr. Taylor's companions immediately complied with the responding officers'

commands to stop and show their hands, Mr. Taylor did not. Instead, he made a 180-turn and

walked away. Firearms in hand, but not pointed at Mr. Taylor, officers followed Mr. Taylor. The

officers repeatedly ordered him to stop and show his hands. Mr. Taylor did not. Instead, he

verbally challenged the officers, kept walking, and placed at least one of his hands in his

waistband. A short time later, Mr. Taylor turned to face one of the officers, but continued

walking backwards. Both of Mr. Taylor's hands were then concealed in the front of his

waistband; they appeared to be digging there, as if Mr. Taylor were manipulating something.

One of the officers trained his firearm on Mr. Taylor and ordered him to stop and show his

hands. Mr. Taylor verbally refused and kept walking backward. Then, without any verbal

warning, Mr. Taylor quickly lifted his shirt with his left hand—exposing his lower torso—and

virtually simultaneously withdrew his right hand from his waistband. The motion took less than

one second and was consistent with the drawing of a gun. Reacting to Mr. Taylor's rapid

movement, the officer shot Mr. Taylor twice—firing in quick succession. Mr. Taylor died at the

scene. When he was searched, Mr. Taylor was unarmed; in particular, he did not have a gun.

> In its Opinion, the Tenth Circuit stated:
>
> Over thirty years ago, the Supreme Court recognized the cold reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). And, regarding such circumstances, the Fourth Amendment is clear: officers need not wait until they see the gun's barrel or the knife's blade before using deadly force to protect themselves or those around them. *See, e.g., Est. of Larsen ex rel. Sturdivan v. Murr ("Est. of Larsen")*,

511 F.3d 1255, 1260 (10th Cir. 2008). They must simply act reasonably. *See, e.g., Kisela v. Hughes*,    U.S.    , 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018).

*Estate of Taylor v. Salt Lake City*, No. 19-4085, 2021 U.S. App. LEXIS 32046, at *1 (10th Cir. Oct. 26, 2021). This analysis is fatal to the Plaintiff's claims in the present suit.

To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable." *Id*., quoting *Estate of Larsen v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (citation omitted). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985).

> The reasonableness of a particular use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Bond*, 981 F.3d at 815 (quoting *Graham*, 490 U.S. at 396); *see Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) ("The reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions." (quoting *Graham*, 490 U.S. at 396-97)); *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) ("We are not well-suited to act as a police supervisory board, making finely calibrated determinations of just what type of misbehavior justifies just what level of response."); *see also Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015) (holding that a police officer's "decision to use deadly force" was "reasonable," when "faced with a rapidly escalating situation" and "severe threat to himself and the public," even though it "may appear unreasonable in the 'sanitized world of our imagination'" (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996))); *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (noting that a use of force must be viewed through the lens of a reasonable officer on the scene and "Monday morning quarterbacking is not allowed"). However, "[o]ur precedent recognizes that the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Est. of Valverde ex rel. Padilla v. Dodge ("Valverde")*, 967 F.3d 1049, 1060 (10th Cir. 2020) (quoting *Pauly v. White*, 874 F.3d 1197, 1219 (10th Cir. 2017)).

> This "calculus of reasonableness must [also] embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances

that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (quoting *Graham*, 490 U.S. at 396-97); *see Valverde*, 967 F.3d at 1060 ("The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others. This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes. The Constitution is not blind to the fact that police officers are often forced to make split-second judgements." (quoting *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 612, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015))); *id.* at 1062 ("The Constitution permits officers to make reasonable mistakes. Officers cannot be mind readers and must resolve ambiguities immediately."); *cf. Brown v. United States*, 256 U.S. 335, 343, 41 S. Ct. 501, 65 L. Ed. 961 (1921) (Holmes, J.) ("Detached reflection cannot be demanded in the presence of an uplifted knife.").

"[I]f a reasonable officer in [the] [d]efendant['s] position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others," that officer's use of force is permissible. *Est. of Larsen*, 511 F.3d at 1260 (emphasis omitted) (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)); *see Garner*, 471 U.S. at 11 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *Valverde*, 967 F.3d at 1060 ("'Courts are particularly deferential to the split-second decisions police must make' in situations involving deadly threats." (quoting *Smart*, 951 F.3d at 1177)).

*Estate of Taylor v. Salt Lake City*, No. 19-4085, 2021 U.S. App. LEXIS 32046, at *24-27 (10th Cir. Oct. 26, 2021). In *Estate of Taylor*, the Tenth Circuit granted qualified immunity to the law enforcement officers. In so doing, they held that it was insignificant whether an individual was arrested for a minor crime or was not even a criminal suspect if it reasonably appeared that he was about to shoot a gun at an officer from close range. *Id*., quoting *Valverde*, 967 F.3d at 1061; *citing Reavis*, 967 F.3d at 985; *and citing Cordova*, 569 F.3d at 1190. "Officers cannot be mind readers and must resolve ambiguities immediately." *Estate of Taylor , quoting Valverde*, 967 F.3d at 1062. "And, based on the totality of the circumstances, we are constrained to conclude that Officer Cruz's split-second decision to use deadly force against Mr. Taylor was reasonable." *Estate of Taylor v. Salt Lake City*, No. 19-4085, 2021 U.S. App. LEXIS 32046, at

*66-67 (10th Cir. Oct. 26, 2021). Thus, the Tenth Circuit determined that the district court properly granted the law enforcement officers qualified immunity.  The facts of *Estate of Taylor* are almost identical to the present case. Defendant Starr perceived that the Plaintiff was about to shoot deputies from close range. Thus, he made the split-second decision to use deadly force. A review of the Undisputed Facts in this matter reveal that the Plaintiff failed to comply with any orders of law enforcement and then admitted to reaching for his gun. These facts demonstrate that Defendant Starr is entitled to qualified immunity.

A new case decided by the United States Supreme Court, *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021), also supports the Defendant's entitlement to qualified immunity. In *Bond*, law enforcement officers encountered the decedent on the side entrance of his garage. A law enforcement officer gestured with his hands and took one step toward the doorway, causing the decedent to take one step back. The decedent turned around and walked toward the back of the garage where his tools were hanging over a workbench. No officer was within six feet of the decedent. The decedent then grabbed a hammer from the back wall over the workbench and turned around to face the officers. The decedent grasped the handle of the hammer with both hands, as if preparing to swing a baseball bat, and pulled it up to shoulder level. The officers backed up, drawing their guns. The officers can be heard yelling at the decedent to drop the hammer. He did not. Instead, the decedent took a few steps to his right, coming out from behind a piece of furniture so that he had an unobstructed path to one of the officers. He then raised the hammer higher back behind his head and took a stance as if he was about to throw the hammer or charge at the officers. In response, the officers fired their weapons, killing the decedent. In reversing the Tenth Circuit, the United States Supreme Court stated:

> The Tenth Circuit contravened those settled principles here. Not one of the
> decisions relied upon by the Court of Appeals—*Estate of Ceballos* v. *Husk*, 919

14

> F. 3d 1204 (CA10 2019), *Hastings* v. *Barnes*, 252 Fed. Appx. 197 (CA10
> 2007), *Allen*, 119 F. 3d 837, and *Sevier* v. *Lawrence*, 60 F. 3d 695 (CA10 1995)—
> comes close to establishing that the officers' conduct was unlawful. The Court
> relied most heavily on *Allen*. But the facts of *Allen* are dramatically different from
> the facts here. The officers in *Allen* responded to a potential suicide call by
> sprinting toward a parked car, screaming at the suspect, and attempting to
> physically wrest a gun from his hands. 119 F. 3d, at 841. Officers Girdner and
> Vick, by contrast, engaged in a conversation with Rollice, followed him into a
> garage at a distance of 6 to 10 feet, and did not yell until after he picked up a
> hammer. We cannot conclude that *Allen* "clearly established" that their conduct
> was reckless or that their ultimate use of force was unlawful.

*City of Tahlequah v. Bond*, 142 S. Ct. 9, 12 (2021). Again, the same analysis applies herein.

Based on clearly established law, Defendant Starr's conduct was not reckless and his use of force

was not unlawful. Instead, the Plaintiff himself admitted that he grabbed his gun and may have

looked aggressive. *See Undisputed Fact*, at ¶ 28. Therefore, Defendant Starr is entitled to

qualified immunity in this matter.

**B.     Defendant Starr Is Entitled to Qualified Immunity with Regard to Count II, Violation of the 4th and 14th Amendments (Failure to Warn Before Using Deadly Force).**

The analysis above, applies to Count II of the Plaintiff's Complaint as well. Moreover,

*White v. Pauly*, 137 S. Ct. 548 (2017), establishes that Defendant Starr's conduct was reasonable

under the circumstances. In *White,* the Pauly brothers heard someone yelling, "'We're coming

in. We're coming in.'" The brothers claim they did not hear the officers identify themselves as

state police. The brothers armed themselves, and yelled at the police officers that "'We have

guns.'" Officer White parked at the first house and was walking up to its front door when he

heard shouting from the second house. He half-jogged, half-walked to the Paulys' house, arriving

"just as one of the brothers said: 'We have guns.'" White shot and killed Samuel but failed to

identify himself as a law enforcement officer and did not shout a warning.

The United States Supreme Court stated:

> This is not a case where it is obvious that there was a violation of clearly
> established law under *Garner* and *Graham*. Of note, the majority did not conclude
> that White's conduct—such as his failure to shout a warning—constituted a run-
> of-the-mill Fourth Amendment violation. Indeed, it recognized that "this case
> presents a unique set of facts and circumstances" in light of White's late arrival on
> the scene. 814 F. 3d, at 1077. This alone should have been an important indication
> to the majority that White's conduct did not violate a "clearly established" right.
> Clearly established federal law does not prohibit a reasonable officer who arrives
> late to an ongoing police action in circumstances like this from assuming that
> proper procedures, such as officer identification, have already been followed. No
> settled Fourth Amendment principle requires that officer to second-guess the
> earlier steps already taken by his or her fellow officers in instances like the one
> White confronted here.

***White v. Pauly***, 137 S. Ct. 548, 552 (2017).

In the present case, there is no question but that the Plaintiff understood he was dealing with law enforcement officers. That is evident based on the conversation between the Plaintiff and the deputies. ***See Exhibit E***. Moreover, the deputies had their firearms pointed at the Plaintiff at all times material hereto. ***See Undisputed Fact***, at ¶ 15. Moreover, the Plaintiff himself indicated he understood why the law enforcement officer shot him when he reached for his gun. ***Id.***, at ¶ 22. Based on the facts of this case, and the United States Supreme Court holding in ***White***, Defendant Starr is entitled to qualified immunity in this matter.

### C. Defendant Starr Is Entitled to Qualified Immunity with Regard to Count III, Violation of the 4th and 14th Amendments (Use of Force on Subdued Person).

The analysis above, applies to Count III of the Plaintiff's Complaint as well. Further, in ***Estate of Taylor***, the law enforcement officer similarly shot twice in rapid succession. There was no determination in ***Estate of Taylor*** that the officer's second shot was a use of force on a subdued person. Moreover, the audio recording indicates that Defendant Starr's second shot was taken immediately following the first. ***See Exhibit E***, at 28:53. Defendant Starr testified that he was so focused on the threat, the gun, and the Plaintiff's draw stroke to produce the gun into a gunfight with his fellow deputies on scene that he placed his bullet near the gun. ***See Deposition***

16

*of Deputy Starr*, at p. 95, lines 8-15, attached hereto as Exhibit F. His second shot was his

follow-up and was done in quick succession. *Id*., at p. 95, lines 16-20. The undersigned was

unable to find any case in which it was held that firing a second follow-up shot violated an

individual's rights or clearly established law. Thus, Defendant Starr is also entitled to qualified

immunity with regard to this claim as well.

**II. The Plaintiff's Claims Under the New Mexico Tort Claims Act Fail.**

Defendant Starr acknowledges that "[l]aw enforcement officers may be subject to claims

for battery in the course of their duties when their force is unlawful and unprivileged." *Sanchez*

*v. Baker*, 457 F. Supp. 3d 1143, 1161-62 (D.N.M. 2020). However, as set forth above, Defendant

Starr's use of force was both lawful and privileged. Recently, the New Mexico Court of Appeals

held:

> The current iteration of a "general rule," or privilege, or law enforcement officers
> to use force,  drawn from the same source that the *Reynaga* court quoted, states:
>
> Police officers may not be held liable in an action for assault and battery for the
> use of reasonably necessary force in the enforcement of the law. Officers
> are privileged to use force or commit battery when making a lawful arrest. The
> test for qualified privilege in an assault and battery suit is both subjective and
> objective: the officer must subjectively believe that he or she used no more force
> than necessary, but the officer's judgment is compared to that of a hypothetical
> reasonable police officer placed in the same situation. The use of deadly force
> by a peace officer is privileged where used to prevent death or serious bodily
> harm to the officer or other persons.

*Hernandez v. Parker*, No. A-1-CA-38635, 2022 N.M. App. LEXIS 5, at *23-24 (Ct. App. Feb.

1, 2022), citing 6 Am. Jur. 2d, *Assault & Battery* § 104 (2021) (footnotes omitted). Based on the

Undisputed Facts above, Defendant Starr believed that he was using no more force than

necessary under the circumstances. Moreover, his use of force was reasonable when compared to

the hypothetical officer placed in the same situation. *See Undisputed Facts*, at ¶¶ 24-27. Finally,

the Plaintiff himself stated that when he reached for his firearm, he understood that he appeared

aggressive, causing them to shoot him. *Id*., at ¶ 28. Therefore, Defendant Starr is entitled to

summary judgment on Count IV of the Plaintiff's Complaint as well.

## CONCLUSION

Following the events at issue in this litigation, the Plaintiff made the following voluntary

statement to law enforcement:

Kevin Torgerson:      I, I don't know.  They just, I can, I can, I kept telling them look, I just need a fucking cigarette.  My car is fucked up.  I'm just gonna put this gun down.  I showed them the gun.  I said I just want a cigarette, a drink, and I wanna go and I wanna get my car ****.  I've done nothing wrong, and there's nothing wrong ****.

Det. Carroll:   Mm hmm.

Kevin Torgerson:      I guess eventually I just went for it to put it down.  Not in a hostile, like drawl way.   And then they just all  shot me.

Det. Carroll:   But do you think, and this is just me, like –

Kevin Torgerson:      It was probably aggressive looking I know.

*See Undisputed Fact*, at ¶ 28. This statement, coupled with the observations of the law

enforcement officers that interacted with the Plaintiff, listed in the Undisputed Facts herein,

reveal that Defendant Starr's conduct was reasonable and lawful. Therefore, Defendant Starr is

entitled to qualified immunity in this matter, and the Defendant's Motion for Summary Judgment

should be granted.

Respectfully submitted,

LAW OFFICE OF JONLYN M. MARTINEZ, LLC

*Electronically filed February 23, 2022*
By:   */s/ Jonlyn M. Martinez*
   JONLYN M. MARTINEZ
   Attorneys for Defendant
   P.O. Box 1805
   Albuquerque, NM  87103-1805
   (505) 247-9488

18

I hereby certify that a copy of the foregoing
was sent via CM/ECF to all counsel
of record on February 23, 2022:

_____/s/_____