IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KEVIN TORGERSON,                      )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        Case No. 21-cv-00204 DHU-LF
                                     )
CHRISTOPHER STARR,                   )
                                     )
            Defendant.               )

**RESPONSE TO DEFENDANT STARR'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Kevin Torgerson, by and through undersigned counsel, hereby responds to

Defendant Starr's Motion for Summary Judgment as follows:

## I.    INTRODUCTION

On March 2, 2020, Plaintiff, Kevin Torgerson ("Kevin"), was involved in a single car

accident on State Road 333 which is near the Carnuel exit on I-40, which is within Tijeras Canyon.

Because his car was inoperable, Kevin started walking away towards I-40.  Several I-40 motorists

called 911 to report the circumstance of someone walking along I-40.  The call was relayed to the

Bernalillo County Sheriff's Office and Deputy Matthew Volk responded to the 911 call.

Deputy Volk encountered Kevin shortly after daylight.  He first noticed that Kevin climbed

over a fence and was walking away.  Deputy Volk then saw that Kevin had a handgun in his hand,

but he placed it in his waistband while walking.  Deposition of Matthew Volk at 41:10-12, attached

as **Exhibit 1**. Because of his concerns with the handgun, Deputy Volk reported over the radio that

the individual that they thought was in the accident appeared to be armed.  Deputies Micah Barkar,

Alejandra Heredia and Miguel Rivas responded.  After they arrived and encountered Kevin, the

deputies engaged Kevin.  Deputy Volk, from a distance of approximately 30 yards, viewed the

encounter that Deputies Heredia, Rivas and Barkar had with Kevin over a period of almost 40

minutes. During that period of time, Deputies Heredia, Barkar and Rivas interacted with Kevin from a distance that varied from 10 feet to 25 yards. None of the deputies had any information that following the traffic accident Kevin was anything but a stranded motorist. Deposition of Alejandra Heredia at 13:4-8, attached as **Exhibit 2**; Deposition of Micah Barkar at 38:11-17, attached as **Exhibit 3**; and Deposition of Miguel Rivas at 15:8-14, attached as **Exhibit 4**. Specifically, the deputies had no information that Kevin had engaged in any previous violent conduct whatsoever. Exhibit 2 at 12:11-15 and 14:17-15:2; Exhibit 3 at 39:13-19; and Exhibit 4 at 17:23-18:3. The deputies had no information that Kevin was a felon and therefore prohibited from possessing a firearm. Exhibit 2 at 15:13-15, Exhibit 3 at 40:9-12, and Exhibit 4 at 17:23-18:3. All of the deputies acknowledged that Kevin had a constitutional right to possess a firearm. Exhibit 2 at 15:13-21 and Exhibit 3 at 40:9-12 and 41:7-10. All of the deputies thought Kevin was impaired or disabled either by trauma from the accident, or mental disease or defect, or drug or alcohol impairment. Exhibit 2 at 20:15-23 and 18:17-19:15, Exhibit 3 at 42:8-21, and Deposition of Christopher Starr at 79:21-80:4, attached as **Exhibit 5**.

During the 40-minute encounter, Deputy Rivas, from a distance of approximately 20-30 feet, had his rifle out and it was either pointed at Kevin or at a low ready position. Similarly, Deputies Heredia and Barkar had service issued 9mm Glocks in the same firing position or low ready. Exhibit 3 at 46:12-18. All of the deputies acknowledged that the only purpose in interacting with Kevin was to disarm him so that they could talk to him about the accident. Exhibit 2 at 20:4-21:15, and Exhibit 3 at 47:16-48:1. All four deputies acknowledged that they did not have probable cause to arrest him. Exhibit 2 at 12:11-15 and 14:17-15:2, Exhibit 3 at 42:5-7.

At no point during the 40-minute interaction did any of the deputies ever see Kevin draw or attempt to grab the handgun that was in his waistband. Exhibit 2 at 22:4-10; Exhibit 3 at 51:1-

8 and 59:24-60:2; and Exhibit 4 at 53:5-16. All of the deputies said that they were not placed in fear of death or serious bodily injury at any time during their 40-minute encounter with Kevin. Exhibit 2 at 35:20-23, Exhibit 4 at 88:12-14 and Barkar on-scene interview attached as **Exhibit 6**. All of the deputies testified that had they been in such fear, they would have fired their weapons, which they did not do. Exhibit 2 at 41:3-18 and 45:22-24; Exhibit 3 at 51:9-22; and Exhibit 4 at 63:7-14.

Deputy Starr arrived on the scene of the 40-minute interaction with Kevin shortly after Deputies Heredia, Rivas and Barkar arrived. Deputy Starr set up a position further away, but ultimately closed the distance to about 30 yards. Deputy Starr claimed hat he had a clear line of sight to the interaction between Kevin and the three deputies that were talking to him but could not hear their discussion. Exhibit 5 at 44:1-2; 59:20-25; 62:13-63:25. What is most significant is that Deputy Starr was interviewed three days after he shot Kevin twice by Detective Carroll of the Bernalillo County Sheriff's Department who was conducting an independent investigation of the officer involved shooting. In that interview, Deputy Starr stated that he took the safety off of his rifle and was prepared to fire when Kevin "exposed his firearm." *Id.* at 103:5-24. Deputy Starr testified that when Kevin allegedly exposed his gun there was "just a possibility of someone being hurt." *Id*. at 104:8-16. Deputy Starr then told Detective Carroll that Kevin "reached for the gun. And at that point, I fired one round, and I believe I followed it with a second." *Id*. at 106:5-10.

At his deposition, which was taken on October 27, 2021, Deputy Starr's testimony was radically different from his statement to Detective Carroll. Incredulously, Deputy Starr would not agree that his memory was better three days after the incident as compared with a year and a half later. *Id*. at 106:11-16. In his deposition, Deputy Starr said that after witnessing the 40- minute interaction between Kevin and the three deputies who were closer, he closed to an area of

3

approximately 25-30 yards. *Id*. at 90:14-16.  Deputy Starr acknowledged that he had the same information possessed by the other deputies. Specifically, Deputy Starr knew that Kevin had been in an accident and believed Kevin was under the influence of alcohol or narcotics. *Id*. at 79:21-80:4. He acknowledged that he had no information that Kevin was a suspect in any violent crime. Deputy Starr testified that he saw Kevin put his hands on his head, a position that he acknowledged was not threatening. *Id*. at 93:16-19.  After he saw Kevin with his hands on his head, Deputy Starr testified that Kevin "quickly reaches back and grabs the gun, acquiring a firing-type grip on the handle. And it's at that time that I fired my first round." *Id*. at 93:20-24.  Deputy Starr testified that the two shots were directed at Kevin's center mass. *Id*.  at 94:20-25.

In his deposition, Deputy Starr acknowledged that he never told anything like that to Detective Carroll three days after he fired the shots and that he specifically never told Detective Carroll that Kevin "grasped the gun." *Id*. at 106:21-25.  Deputy Starr acknowledged that there is a big difference between making "a movement towards something and actually putting your hand on the handle" of a gun. *Id*. at 107:1-9.  Most directly, in his deposition, Deputy Starr acknowledged that he never said anything to Detective Carroll that Kevin actually had his hands on the handle of the gun. *Id*. at 107:10-13.

No video evidence of the shooting exists. BCSO Deputies at the time of the shooting were equipped with audio recording devices referred to as "belt tapes." Deputy Starr's belt tape has only 13 seconds of audio despite Deputy Starr being on scene for well over 30 minutes. Deputy Heredia's belt tape captured audio of the shooting. Immediately before shots were fired, Deputy Heredia and Kevin were having a conversation which indicated he was complying with Deputy commands at the moment in time he was shot. Deputy Heredia Belt Tape provided as Exhibit 7, timestamp 28:35-28:50. Deputy Heredia is cut off by gunfire as she is speaking to Kevin. *Id*.

4

## II.   PLAINTIFF'S RESPONSE TO DEFENDANT'S UNDISPUTED FACTS

1.      Plaintiff agrees with Defendant's Undisputed Facts ("DUF") in paragraphs 1 through 6.

2.      Plaintiff partially admits and partially denies DUF 7.  Defendant Volk saw Mr. Torgerson with a gun in his hand, but "[h]e never raised it from his side.  Again, this is within a few seconds.  I gave him the commands to "Drop the gun or I'll shoot you." And he put the gun back in his waistband." Exhibit 1 at 40:5-10.  Deputy Volk actually clearly saw Kevin put the gun back in his waistband. Exhibit 1 at 41:10-12.  At the time Kevin put the gun in his waistband, Deputy Volk testified that Kevin's "not reaching for it again or any overt movements that would lead me to believe that he was presenting an imminent threat." Exhibit 1 at 43:25-44:4.

3.      Plaintiff agrees with DUF 8 through 10.

4.      Plaintiff disputes DUF 11. The portion of the deposition transcript cited by Defense states "[Kevin] walks away from us and continues to go west. And then he starts to walk northwest, up an embankment. That embankment leads up to Highway 333 to the area of the exit. Q: And what did you do? A: I knew that Deputy Rivas was up on 333 and he was going to probably end up in the area where Mr. Torgerson was heading…" DUF 11 mischaracterizes that Kevin is purposefully approaching another deputy, when in actuality Kevin was walking away from a deputy and coincidentally happened to be headed in a direction that Deputy Barkar expected another deputy to "end up in the area where Mr. Torgerson was heading."

5.      Plaintiff agrees with DUF 12 and 13.

6.      Plaintiff disputes DUF 14. The deposition transcript cited by Defense actually says that the firearm was located "**in the small of his back.** It is in his waistband." The precise location of the gun on Kevin's person is material in this case because any movement Kevin makes to reach

the firearm would necessarily look different if he reached for a gun that was on his hip or had to reach around his hip and retrieve the gun from the small of his back. DUF 14 mischaracterizes the location of the gun in a way that suggests the gun is close to Kevin's right hip rather than the gun being located behind Kevin's back. Additionally, **Plaintiff's Complaint**, at ¶ 15 [Document No. 1-2] reads as follows, "During this time, Plaintiff had his gun in his waistband behind his back."

7.      Plaintiff agrees with DUF 15.

8.      Plaintiff agrees that DUF 16 is partially true though the facts are incomplete and Plaintiff disputes the contention that he refused to follow deputies' commands at all times during the incident.  During the 40-minute interaction that the deputies had with Kevin, there were times when he was complying with their demands – the deposition segment cited by Defense actually says that Kevin did place his hands on his head for some quantum of time.  *See also* Plaintiff's Undisputed Facts ("PF") Nos. 9 and 22 indicating that Kevin complied with a command to remove his hands from his front hoodie pocket eleven seconds before he was shot.

9.      Plaintiff agrees with DUF 17 and 18.

10.     Plaintiff disputes DUF 19. While it is true that Starr moved locations several times throughout the encounter, no facts are pointed to in the cited portion of his deposition, Exhibit 5 at 75:24-72:2, which indicates that he was *required* to move, the portion of the record cited to only indicates that Starr moved from one location to another.

11.      Plaintiff admits DUF 20.

12.     Plaintiff disputes DUF 21 because Kevin was partially complying with the commands given by the deputies. *See* Plaintiff's Response to DUF 8 and PF Nos. 8, 9, 23 and 25. Defendant states that the deputies were making efforts to "offer the Plaintiff assistance and to secure his firearm." Kevin was under no obligation to actually accept any "assistance" from the

6

deputies. When Kevin attempted to walk away from Deputy Volk he was followed and was eventually held at gun point by multiple police officers. Kevin was also under no obligation to relinquish the firearm he lawfully possessed to the police. Additionally, the portion of Starr's deposition transcript cited in DUF 21 does not establish that Plaintiff refused to comply with commands – Starr testified that he had difficulty hearing, at the distance he was at from Kevin, Deputy Barkar and Deputy Heredia. Exhibit 5 at 84:23-86:2.

13.     Plaintiff partially agrees with DUF 22 in that approximately 40-minutes elapsed in the interaction between Kevin and Deputies Heredia, Rivas and Barkar.

14.     Plaintiff disputes DUF 23 because as written it creates the misimpression that Kevin was reaching for his gun and misstates the facts in the record. Deputy Heredia's Deposition, Exhibit 2 at 21:25-22:3, does not mention anywhere that Deputy Heredia or any other deputy told Kevin to keep his hands away from his gun. The portion of Deputy Heredia's belt tape offered by Defense does include several statements from Deputy Barkar in where he says "don't touch the gun." Exhibit 7 at 26:55-29:05. The audio tape clearly captures the statements made by Deputies Heredia and Barkar, but does not clearly capture the statements made by Kevin. We also have no video evidence of this interaction. Critical context is missing in evaluating the statements by Barkar. Kevin was not reaching for his gun when Barkar said don't touch the gun. Kevin had asked Barkar if he could drop the gun – and Barkar replied by telling Kevin to not touch the gun as well as "I do not want you to take the gun out of your waistband, for your safety and ours." *Id.* Barkar also suggests to Kevin that he doesn't need to go to his knees and that Kevin could just put his hands on his head so deputies could retrieve the gun, Barkar asks Kevin if this is a "fair compromise." These statements combined with PF Nos. 6-8, 17-21, 23, 25, 30 and 43 show that

Kevin was not told to keep his hands away from his gun because there was any concern about him reaching for the gun.

15.     Plaintiff disputes DUF 24. Deputy Barkar in his deposition describes Kevin's hand as being "about halfway between the pocket [of pass-through pouch or pocket on the front of the hoodie] and his right hip. And at that point, I hear two shots that are fired. And that is the point that I hear gunfire." Exhibit 3 at 56:3-10. Deputy Barkar also consistently described Kevin as having the gun in his waistband in the small of his back. *Id.* at 34:10-12; 55:12-56:12. When asked where exactly the gun was in the waistband, Barkar indicated it was behind Kevin's back and the grip would be pointing towards his right kidney or right love-handle area or right hip. *Id.* at 58:7-25. Barkar notably does not indicate anywhere in his deposition or in his on scene interview that Kevin is reaching around his back with his right hand. *Id*. Barkar indicated Kevin would need to reach around his back to actually grab the gun, "If he was to reach back, he would have been able to grab the handle of the handgun and pull it out. It would have been positioned in a way that he could have reached back with his right hand and grabbed it and drawn it." *Id*. at 58:18-22. The statement in DUF 24 that Kevin's hand is "moving towards the gun" is a conclusory statement which glosses over the fact that the gun was behind his back rather than on his hip.

16.     Plaintiff disputes DUF 25. *See* PF Nos. 6-9, 17-24, 30, 32.

17.     Plaintiff partially agrees with DUF 26. Plaintiff agrees he was shot twice; however, to the extent DUF 26 purports to claim that any particular wound on Plaintiff is an entry wound or indicating the sequence with which a bullet traveled through Mr. Torgerson's body, Plaintiff disputes those claims. While Plaintiff testified as to where he was injured, he could not explain the trajectory or ballistic pathing of either shot – this makes sense given that Mr. Torgerson is not a ballistics expert. Exhibit 8 at 197:12-199:15. No information is in the record that would allow

inferences to be drawn regarding bullet trajectory – a qualified expert witness would need to provide opinion testimony, and neither Plaintiff nor Defendant have retained such an expert.

18.     Plaintiff agrees the testimony is as Defendant describes in DUF 27, but denies that Deputy Heredia's belief is reasonable given the weight of the evidence in this matter, most notably Deputy Barkar's observations. *See* PF Nos. 6-9, 17-24, 30, 32. Consequently, Plaintiff denies DUF 27.

19.     Plaintiff disputes DUF 28.  In his statement to Detective Carroll, Mr. Torgerson said the following:

| | |
|---|---|
| Det. Carroll: | ….Do you remember what they were telling you? |
| Torgerson: | I, I don't know.  They just, I can, I can, I kept telling them look, I just need a fucking cigarrette.  My car is fucked up.  I'm just gonna put this gun down. I showed them the hung. I said I just want a cigarette, a drink , and I wanna go and I wanna get my car ****.  I've done nothing wrong, and there's nothing wrong ****. |
| Det. Carroll: | Mm hmm. |
| Torgerson: | I guess eventually I just went for it to put it down.  Not in a hostile, like drawl way. And then they just all shot me. |
| Det. Carroll: | But do you think, and this is just me, like – |
| Torgerson: | It was probably aggressive looking I know. |
| Det. Carroll: | Because, you know, like maybe grabbing the gun probably wasn't maybe – |
| Torgerson: | **** -- |
| Det. Carroll: | -- the best idea. |
| Torgerson: | No, it wasn't the best idea ****. |
| Det. Carroll: | Bu I just wanted to see, I wanted to understand that – |
| Torgerson: | **** -- |
| Det. Carroll: | -- so I know you're, what you're thinking because what you're thinking and what we think, you know – |

| | | |
|---|---|---|
| Torgerson: | I wasn't trying to hurt nobody. | |
| Det. Carroll: | Okay.  So you weren't, like you weren't – | |
| Torgerson: | No. | |
| Det. Carroll: | -- going to try to shoot it out with them or anything like that – | |
| Torgerson: | No, honestly, no. | |

Most specifically, Mr. Torgerson testified in his deposition as follows:

> Q.    So you're saying your memory of what happened today in December of 2021 is better than the statement that you gave to law enforcement immediately following the incident?
>
> A.    I would say so.
>
> Q.    Why would you believe that?
>
> A.    I mean, one, I'm on morphine. Two, I know that I was not trying to hurt nobody. I never touched that gun. No matter what. Just period.

Torgerson Depo, attached as **Exhibit 8**, at 65:12-22.

## III.    PLAINTIFF'S UNDISPUTED FACTS

1.    According to Deputy Heredia she was called to assist a motorist who was meandering along a freeway and who possibly been involved in an accident. Exhibit 2 at 13: 4-7.

2.    Deputy Heredia's understanding when she responded to that call was that Kevin had not been engaged in any type of violent felony and that there was no need to arrest him. Exhibit 2 at 12:11-15 and 14:17-15:2.

3.    Deputy Heredia acknowledged that Kevin had a right to possess a firearm in New Mexico and that, from her perspective at the time, Kevin's possession of a firearm was not "a crime in the slightest" nor did it give rise to suspicion of criminal activity. Exhibit 2 at 15:13-21.

4.    Even when Kevin walked away from the accident, Deputy Heredia acknowledged that gave her no probable cause that Kevin had been involved in a crime. Exhibit 2 at 16:11-15.

By the time Deputy Heredia arrived at the scene, she had no further knowledge that Kevin had been involved nor was a suspect in any prior crime and that there was no probable cause to think he had been involved in any criminal activity. Exhibit 2 at 16:16.

5.      Deputy Heredia had reason to believe by virtue of Kevin's behavior, his language, and his non-responsiveness that he either suffered from a traumatic brain injury from the car accident or that he suffered from a mental disease or defect, or he was under the influence of either a drug or alcohol. Exhibit 2 at 20:15-23 and 18:17-19:15.

6.      At no point during Deputy Heredia's 40-minute interaction with Kevin did she see Kevin ever hold a firearm nor did she ever see Kevin grab the handle and pull a firearm out of his waistband. Exhibit 2 at 22:4-10.

7.      Deputy Heredia never saw Kevin point a weapon at any law enforcement officer. Exhibit 2 at 22:21-24. Deputy Heredia additionally testified that she did not feel that her "life was in danger at any time in [her] interaction with Mr. Torgerson." Exhibit 2 at 35:20-23.

8.      Deputy Heredia acknowledged that had Kevin ever grabbed his gun, or drew his gun, she would have used deadly force and shot him. Because she never saw Kevin do anything like that is the reason she did not discharge her firearm in response to Kevin taking those actions. Exhibit 2 at 41:3-18 and 45:22-24. Deputy Heredia testified that Kevin "mov[ing] his hand" was not "perceive[ed]… as causing a threat of death or serious bodily injury." Exhibit 2 at 42:2-9.

9.      At 28:35 of Deputy Heredia's belt tape, the following conversation occurs. Deputy Heredia, "get your hands out of your pocket hun." Deputy Heredia says several more times that Kevin should get his hands out of his pocket. At 28:43 on the Belt Tape, Deputy Heredia says, "thank you". At 28:46, Deputy Heredia says, "Kevin we were doing so good…just put your hands on the top of your head." Kevin replies at 28:50, "I'm not going to hurt you guys." Deputy Heredia

responds, "But I don't know that…." She is interrupted mid-sentence at 28:54 by the sound of Deputy Starr shooting Kevin from a distance of some 75 to 90 feet away with his long rifle. Exhibit 7 at 28:35-28:50.

10.     Deputy Barkar acknowledged that the original information that he received from dispatch with regard to the motor vehicle accident near Carnuel was that "a distraught looking male subject [was] leaning against the concrete divider down on I-40." Exhibit 3 at 38:11-17.

11.     Deputy Barkar acknowledged that there was no allegation that Kevin had been engaged in criminal conduct involving a violent offense or something of that nature at the time he responded to the call. Exhibit 3 at 39:13-19.

12.     Deputy Barkar acknowledged that he had no information at the time that he responded to the 911 call that Kevin was a felon or was in any other way prohibited from possessing a firearm. Exhibit 3 at 40:9-12.

13.     When Deputy Barkar first encountered Kevin, he was not told that he was under arrest nor did he hear anyone else say anything to that effect. Exhibit 3 at 42:5-7.

14.     In the course of Deputy Barkar's interaction with Kevin, Deputy Barkar suspected Kevin suffered from "some kind of altered mental state," but he did not know if the cause "was from a substance or mental health issue or concern." Exhibit 3 at 42:8-16.

15.     Deputy Barkar also acknowledged by virtue of the motor vehicle accident he factored in the possibility of head trauma as well. Exhibit 3 at 42:17-21.

16.     Deputy Barkar acknowledged that he drew his handgun during the course of the 40-minute interaction, as well as Deputy Heredia. Exhibit 3 at 46:12-18.

17.     Deputy Barkar acknowledged that he never "with his eyes" saw Kevin reach for a firearm. Exhibit 3 at 51:1-8.

18.     Had Kevin reached for a firearm, Deputy Barkar would have discharged his drawn firearm because Kevin would have put him in danger. Exhibit 3 at 51:9-15.

19.     Deputy Barkar acknowledged the fact that he did not discharge his handgun was because he never observed Kevin "making a play for his gun." Exhibit 3 at 51:16-22.

20.     Deputy Barkar acknowledged that he could see Kevin's "firearm pretty – pretty plainly" during a lot of the 40-minute conversation that he had with Kevin. Exhibit 3 at 55:12-56:2.

21.     At all times during Deputy Barkar's 40-minute interaction with Kevin, he never saw Kevin "touch the firearm." Exhibit 3 at 59:24-60:3.

22.     Deputy Barkar in his on-scene interview given the same day the shooting occurred with officers conducting the officer involved shooting investigation described the movement of Kevin's hands immediately before the shooting stating that Kevin had both of his hands in the front pocket of his hoodie and that "he had taken those out and had them at his side near his waistband right before I…right before I heard the shot."  Exhibit 6 at 30:30-31:20.

23.     Deputy Barkar stated in his on-scene interview that before the shots rang out that Kevin's gun was exposed and "I could clearly see it." Deputy Barkar stated that Kevin's hand was "near his hip" when the shot rang out. *Id.* at 33:50-34:24.

24.     Deputy Barkar stated in his on-scene interview that when Kevin fell after being shot, he observed the handgun fall out of Kevin's waistband and land on the ground near Kevin's legs. *Id.* at 25:40-26:17.

25.     When asked during his on-scene interview if Kevin had threatened him, Deputy Barkar replied, "No, he never threatened to hurt us or shoot us or anything like that. He just didn't

understand why we wanted to take his gun, he said it was a legally owned gun for his own self defense." *Id.* at 31:44-32:04.

26.     Deputy Rivas acknowledged that there was not an allegation that the crash and the potential motorist walking near the freeway had previously engaged in criminal activity. Exhibit 4 at 15:3-8.

27.     Deputy Rivas acknowledged when he drove to respond to Kevin walking near the freeway that he was not reporting to a crime scene. Exhibit 4 at 15:9-14.

28.     Deputy Rivas acknowledged at the time he responded to the 911 call there was never an allegation that Kevin used a firearm. Exhibit 4 at 17:23-18:3.

29.     Deputy Rivas acknowledged that when he was on the scene that Kevin identified himself by his first name, but Rivas didn't "think he said his last name." Exhibit 4 at 20:10-16.

30.     Rivas acknowledged that he never saw Kevin "make a grab towards his waistband" and that he never saw Kevin grab the firearm that was in his waistband. Exhibit 4 at 53:5-16. Deputy Rivas observed that Kevin's hand was near his waistband "but after I assess the situation, I realize he did not grab it." Exhibit 4 at 63:7-14.

31.     By virtue of his 40-minute interaction with Kevin, Deputy Rivas never thought he needed to use deadly force against Kevin. Exhibit 4 at 88:12-14.

32.     Defendant Starr admitted in his deposition that following the shooting the gun came out of Kevin's waistband. Exhibit 5 at 97:12-19.

33.     Starr claims that he actually saw Kevin's hand on the handle of Kevin's firearm immediately before shooting Kevin. *Id.* at 94:2-12. Starr testified that had Kevin not put his hand on the handle that he would not have shot Kevin. *Id.* at 101:9-14. Starr further testified that if

Kevin was not putting his hand on the handle of the gun that Kevin would not have presented a threat of inflecting death or serious injury to officers or anyone else. *Id*. at 101:15-19.

34.     Defendant admitted in paragraph 23 of Plaintiff's complaint that he did not provide a warning to Plaintiff before he shot him.

35.     In response to Interrogatory No. 19, which requested that the Defendant "State each fact that supports the following portion of your answer to paragraph 53 of the Plaintiff's Complaint, 'The Defendant denies that the circumstances reasonably would have allowed him to give warning to Plaintiff,'" Starr answered, "The Defendant had no opportunity to provide any warning prior to discharging his firearm."

36.     In response to Plaintiff's Request for Admission No. 2, Starr admitted that he had good visualization of the Plaintiff at the time he shot him. Starr RFA responses attached as **Exhibit 9**.

37.     The shooting took place on a clear day, during the daytime, with no weather conditions present which would negatively impact visibility. *See* Photograph attached as **Exhibit 10**.

38.     In his deposition, Starr testified that he became concerned when the handle of Kevin's firearm became visible in Kevin's waistband. Exhibit 5 at 84:1-15. Starr further testified that around three to five minutes passed between him observing the handle of Kevin's gun and his shooting Kevin.

39.     In response to Plaintiff's Request for Admission No. 3, Starr admitted that he did not hear any other law enforcement officer provide a warning to Plaintiff that he would be shot. Exhibit 9.

40.     Starr resolved to shoot Kevin if he observed any movement where Kevin would reach for his gun after Starr noticed that Kevin's gun was exposed. Exhibit 5 at 102:21-103:24 and 104:8-105:14.

41.     Add fact that he had at least 3-5 min to warn. He made multiple dispatch calls during standoff demonstrating he had time available. *Id*. at 89:7-90:7; 91:14-93:10.

42.     Kevin is left handed. Exhibit 8 at 232:7-24

43.     Kevin had his gun in the small of his back in his waistband. Exhibit 3 at at 34:10-12; 55:12-56:12.

44.     In the moments before he was shot, Kevin did not reach for his firearm. Exhibit 8, at 65:12-22.

## IV.     PLAINTIFF'S FACTS SHOULD BE ADOPTED

In *Thomson v. Salt Lake County,* the Tenth Circuit succinctly described the applicable standard to resolve disputes of fact when federal courts consider a summary judgment motion seeking dismissal pursuant to qualified immunity:

> "The plaintiff first must shoulder a heavy two-part burden. In determining whether a plaintiff has carried its two-part burden of proving (1) that defendant violated a constitutional right and (2) that the right was clearly established, ordinarily courts must "adopt" plaintiff's "version of the facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *see id.* at 378, 127 S.Ct. 1769 ("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion. In qualified immunity cases, this usually means adopting ... the plaintiff's version of the facts." (second alteration in original) (citations omitted) (internal quotation marks omitted)); *see Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir.2009) (noting that generally in the qualified immunity context in addressing the legal inquiry "we accept the facts as the plaintiff alleges them"); *see also Whittier v. Kobayashi,* 581 F.3d 1304, 1307 (11th Cir.2009) ("We resolve all issues of material fact in favor of the plaintiff, and then, under that version of the facts, determine the legal question of whether the defendant is entitled to qualified immunity.")".

*Thomson v. Salt Lake County*, 584 F.3d 1304, 1325 (10th Cir. 2009).

Starr argues on Page 9 of his motion that two audio tapes compel summary judgment be granted in his favor because the audio tapes purportedly, "documents the Plaintiff's behavior and his statements concerning his behavior." Starr refers to two audio recordings: 1) Deputy Heredia's Belt Tape and 2) the recorded interview between officers conducting an officer involved shooting investigation and Kevin in his hospital room. Neither audio recording blatantly contradicts Kevin's version of events and Kevin's facts should therefore be adopted.

Deputy Heredia's Belt Tape, Plaintiff's Exhibit 7, does provide valuable evidence, but it in of itself unfortunately does not establish beyond a doubt what Kevin's actions are immediately before he is shot. If a video did exist that showed the movement of his hands, the trier of fact would have conclusive proof as to whether Kevin reached for his gun or made other hostile movements. Unfortunately, the audio recording simply cannot do this. The audio recording does however establish a timeline of events very favorable to Plaintiff's version of events being credited by this Court. Kevin was shot eleven seconds after he complied with Deputy Heredia's request to take his hands out of his front hoodie pocket. PF No. 9. Kevin was shot four seconds after saying to Deputy Heredia, "I'm not going to hurt you guys." *Id.* Kevin was shot while having a normal non-threatening conversation with Deputy Heredia. *Id.*

The statement taken from Kevin in the hospital is grossly unreliable. He was recovering from major life saving surgery after having been shot by Starr. The Defense attached an audio recording of this interview as Defendant's Exhibit J. Actually seeing Kevin in the condition he was in at the time the statement was given bears on the reliability of the statement – which is why the Plaintiff offers the video recording of this interview as their **Exhibit 11**. Kevin is in a hospital bed, receiving IV fluids, and has both of his arms immobilized in hard casts. Kevin, in his drug induced stupor, speculates that he must have done *something* to be shot and *guesses* that he must

have went to put his gun down. *Id*. This statement from Mr. Torgerson is not a recollection – it is speculation. Exhibit 8, at 65:12-22. We further know that this statement Kevin made in the hospital is not reliable because Starr's fellow officers, most notably Micah Barkar, described that Kevin did not reach for or touch his gun. Deputy Barkar specifically stated in his on-scene interview moments after the shooting occurred that he could clearly see the gun before the shooting, that the gun fell out of Kevin's waistband after he was shot, and described that Kevin's right hand was by his right hip. PF Nos. 22, 23 and 24. The gun was described by witnesses as being behind Kevin's back – not on his hip. PF No. 43.

Looking at the facts available in the record a reasonable jury could completely disregard Starr's claim that he saw Kevin making a grab for his gun. No other law enforcement officer on scene actually witnessed Kevin grab his gun in the manner which Starr described in his deposition – which would require Kevin to reach behind his back. Equally important is that no officer whom Starr would be "protecting" on scene ever felt that they were in any danger from Mr. Torgerson. PF Nos. 7, 8, 18, 25, 31.  The other officers on scene uniformly stated that if they believed Kevin was reaching for his gun that they would have shot him, yet Starr is the only officer who fired his weapon. PF Nos. 8, 18, 30, 31. Starr's deposition testimony was materially different from the statement he gave only three days after the shooting in which he never made the claim that Kevin actually touched the gun.  Exhibit 5. at 79:21-80:4; 93:24-19; 93:20-94:25; and 106:21-25.

In his deposition, Deputy Starr acknowledged that he never told anything like that to Detective Carroll three days after he fired the shots and that he specifically never told Detective Carroll that Kevin "grasped the gun." *Id*. at 106:21-25.  Deputy Starr acknowledged that there is a big difference between making "a movement towards something and actually putting your hand on the handle" of a gun. *Id*. at 107:1-9.   Most directly, in his deposition, Deputy Starr

acknowledged that he never said anything to Detective Carroll that Kevin actually had his hands on the handle of the gun. *Id*. at 107:10-13.

Given the standard for resolving fact disputes on summary judgment, this Court should utilize the following facts which are most favorable to Kevin in assessing whether Starr's actions are objectively reasonable under *Graham*, *Larsen* and Tenth Circuit Case Law. Kevin was a nonviolent person who was not suspected of committing any crime. PF Nos. 2, 3, 4, 11, 12, 26. Kevin did have a gun in the back of his waist band in the small of his back. PF No. 43. Kevin was shot eleven seconds after he complied with Deputy Heredia's request to take his hands out of his front hoodie pocket. PF No. 9. Kevin was shot four seconds after saying to Deputy Heredia, "I'm not going to hurt you guys." *Id*.  Kevin was shot while having a normal non-threatening conversation with Deputy Heredia. *Id*. At the time Kevin was shot, he had not made a grab for his gun and did not have his hand on the gun. PF Nos. 6, 7, 8, 9, 17, 18, 19, 20, 21, 22, 23, 24, 30, 32.

Starr did not provide a warning to Kevin before shooting him. PF No. 34. Starr had not heard any other law enforcement officer provide a warning to Kevin that he would be shot. PF No. 39. Starr had good visualization of Kevin before he shot him. PF No. 36. It was daylight with clear conditions when Starr shot Kevin. PF No. 37.

## V.    STARR'S USE OF FORCE WAS NOT OBJECTIVELY REASONABLE

All excessive force claims are evaluated under the Fourth Amendment objective reasonableness standard, judged from the perspective of a reasonable officer on the scene. *Pauly v. White*, 874 F.3d 1197, 1214–15 (10th Cir. 2017)(internal citations omitted). Courts in determining the reasonableness of the manner in which a seizure is effected must pay careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (internal citation omitted). Ultimately, the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force. *Id*. (citing *Estate of Larsen*, 511 F.3d at 1260.) Analyzing this case through the analytical framework established in *Graham* and *Estate of Larsen* it is clear, given the Plaintiff's Facts described in detail in Sections III and IV of this response, that Starr's use of force against Kevin was not objectively reasonable.

A.   THE FIRST *GRAHAM* FACTOR

The first *Graham* factor weighs heavily in Kevin's favor as deputies Heredia and Barkar did not suspect Kevin of committing any crime. PF Nos. 2, 11, 13, 26. The Defense frames this case as deputies offering Kevin "assistance" following his car crash rather than attempting to arrest him for committing a crime. *See* Defendant's Proposed UMF No. 21. This "assistance" came in the form of being held at gunpoint for over half an hour by multiple police officers. Kevin was under no obligation to actually accept assistance from law enforcement or any other person after he crashed his car. Law enforcement was also not obligated to offer "assistance" to Kevin in these circumstances as they had not placed him in danger or enhanced his vulnerability to danger. *See DeShaney v. Winnebago County Dept. of Soc. Services*, 489 U.S. 189, 201, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249 (1989)(holding that the State does not possess a general duty to protect or render aid to its citizens, even when the State has actual knowledge of dangers a citizen may face).

Given that Kevin was not suspected of committing any crime, there was no reason for multiple law enforcement officers to surround him, hold him at gunpoint, and demand that Kevin allow the police to take the firearm, which Deputies Barkar and Heredia admitted Kevin was lawfully in possession of. PF Nos. 2, 11, 13, 26. The first *Graham* factor therefore weighs heavily in Kevin's favor. All of the deputies thought Kevin was impaired or disabled either by trauma from

the accident, or mental disease or defect, or drug or alcohol impairment. Exhibit 2 at 20:15-23 and 18:17-19:15 and Exhibit 3 at 42:8-21, Exhibit 5 at 41:6-19; 79:21-81:22. This observation cuts against any argument that Kevin failing to follow each and every command given to him by law enforcement officers somehow demonstrates that he was a threat. Kevin's failure to follow commands are better attributed to confusion than defiance.

The Tenth Circuit has stated that the nature of the crime suspected in the first *Graham* factor is relevant in assessing whether an officer was reasonable in evaluating ambiguous conduct to assess a threat. *Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020). Here the record is clear that Kevin was not suspected of committing any violent crime or any crime at all. PF Nos. 2, 11, 13, 26.

B.     THE SECOND *GRAHAM* FACTOR

"The second *Graham* factor, whether the suspect pos[ed] an immediate threat to the safety of the officers or others," is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force. *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017). In this case, Starr used deadly force, and the use of deadly force is only justified if the officer had "probable cause to believe that there was a threat of serious physical harm to [himself] or others." *Id.* (citing Estate of Larsen, 511 F.3d at 1260). The Tenth Circuit utilizes a four component test established in *Estate of Larsen* to evaluate the degree of threat facing an officer or others. *Id*. The four *Larsen* components were drawn from leading Tenth Circuit case law as of 2008:

> "In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors. These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect. **See, e.g., Walker v. City of Orem, 451 F.3d 1139, 1159** (10th

Cir.2006) Jiron, 392 F.3d at 414–15; Zuchel v. Spinharney, 890 F.2d 273, 274 (10th Cir.1989).”

*Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)(emphasis added).

Each *Larsen* component is discussed in turn as applied to the Plaintiff's Facts in this case.

    1.    <u>The First *Larsen* Component</u>

Read literally, the first factor in the *Larsen* test presumes that the suspect is actually holding a weapon. In *Larsen,* the suspect had a large knife in his hand during his interaction with law enforcement. As a matter of common sense a suspect who is not actually holding a weapon poses substantially less risk than a suspect who has a weapon in hand ready to use. Given that Kevin was not actually holding his firearm, this factor weighs heavily in Kevin's favor.

When a suspect is not holding a gun when the confrontation begins, "officers can do little more than order the suspect to raise his hands and get to the ground." *Estate of Taylor v. Salt Lake City,* 16 F.4th 744, 766 (10th Cir. 2021)(citing *Valverde*, 967 F.3d at 1061–62 (citing *Garner*, 471 U.S. at 11–12, 105 S.Ct. 1694). Deputy Heredia's audio recording demonstrates that Kevin declined to get down on his knees when requested by law enforcement. Deputy Barkar stated in his on scene interview that Kevin did not understand, "why the police needed his gun which he lawfully owned for his own self defense." PF No. 25. This statement from Barkar supports the inference that Kevin's failure to comply with each and every command given to him by law enforcement was driven by confusion rather than some nefarious motive.

Kevin did engage in a dialogue with deputies and was listening to some of their commands. Deputy Heredia asked Kevin to remove his hands from his front hoodie pocket. Kevin complies with this command and Deputy Heredia can be heard saying "thank you" on her belt tape eleven (11) seconds before a loud gunshot is heard. PF No. 9. This is consistent with Micah Barkar's on scene statement where he indicates that right before Kevin was shot, he had taken both of his hands

out of his hoodie pocket and that his hands were at his side. PF No. 22. As well as Barkar's deposition testimony. Exhibit 3 56:3-10.

2.    The Second *Larsen* Component

The second *Larsen* component is whether any hostile motions were made with the weapon towards the officers. *Estate of Larsen*, 511 F.3d 1255, 1260 (10th Cir. 2008). This is the key dispute of fact in this case. Starr claimed in his initial interview that Kevin made a sudden move for his handgun which prompted him to fire. Starr later claimed in his deposition that Kevin actually had grasped the handle of his gun with his right hand. Exhibit 5 at 93:20-24. Starr acknowledged that he never told anything like that to Detective Carroll three days after he fired the shots and that he specifically never told Detective Carroll that Kevin "grasped the gun." *Id*. at 106:21-25.

The Plaintiff's Facts clearly demonstrate that no hostile movements were made. Barkar's on scene interview and Heredia's belt tape when considered in tandem create powerful and persuasive fact inferences for Plaintiff on this point. Specifically, that Kevin removed his hands from his hoodie front pocket roughly eleven seconds before being shot. PF Nos. 9, 20-24. No officer on scene, aside from Starr, perceived Kevin to make any hostile movement. PF Nos. 6-9, 17-25, 30 . Heredia, Rivas, and Barkar all have excellent ability and capacity to observe Kevin in the moments before he is shot. Heredia is mid-conversation with him and as she is speaking to Kevin she is interrupted by Starr's gunfire. PF No. 9. The tone of Heredia's voice at this point in time is calm rather than stressed or alarmed which suggests at the moment she is speaking, while looking directly at Kevin, that she had not observed any hostile movement from Kevin. PF No. 9. Barkar indicates he clearly sees the gun before the shooting occurs and that it is not in Kevin's hand. PF Nos. 17-25. Barkar further indicates that he saw the gun fall out of Kevin's waistband after he was shot.  PF No. 24.

This set of facts on this point is very similar to *Walker v. City of Orem*, in which the Defendant, Officer Peterson, stated that he believed the suspect was pointing a gun at him before he shot and killed the suspect. 451 F.3d 1139, 1160 (10th Cir. 2006). The Tenth Circuit in *Walker* held that Peterson's belief was not reasonable because they accepted plaintiff's version of events which materially contradicted Peterson's claim that a gun had been pointed at him. *Id*. In the instant case, the weight of the evidence and the applicable summary judgment standards in qualified immunity cases likewise requires that Starr's claim that Kevin reached back and grasped the handle of his gun to be ruled unreasonable and to adopt Plaintiff's version of events. *Id*. This factor is clearly in Kevin's favor.

3.    The Third and Fourth *Larsen* Components

The third *Larsen* factor is the distance between a suspect and law enforcement officers. This factor assesses the immediacy of perceived threats by utilizing distance as a means to discuss 1) the seriousness of a threat to law enforcement based on a weapon's effective range, 2) the officers ability to defend themselves, and 3) the time it would take a perceived threat to actually manifest. For instance, in cases involving melee weapons, the Tenth Circuit has held that even when a suspect is holding a knife and walking towards officers in the confines of a living room that a jury could find (the third *Larsen* component) weighed against probable cause because the jury could find that Tenorio, although walking toward Pitzer, was shot "before he was within striking distance of [Pitzer]." *Tenorio v. Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015). Distance is important because of the time it would take a suspect to strike; someone holding a knife two feet away from an officer could close the distance to strike much faster than someone twenty feet away.

*Estate of Taylor*, which involved a suspect whom police officers thought was armed with a gun, held the third *Larsen* component weighed in favor of the officers because the suspect was

assumed to actually be holding a gun due to him making a motion "consistent with drawing a gun" when he was about 12 feet from the officer. *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 769–70 (10th Cir. 2021)("The short distance separating Mr. Taylor and Officer Cruz, compounded by the absence of immediately accessible cover that Officer Cruz could use to avoid potential harm, causes this third factor to weigh in Defendants' favor. *Cf. Hicks v. Scott*, 958 F.3d 421, 435–36 (6th Cir. 2020) (noting that the officer "reasonably perceived an immediate threat to her safety when a rifle was pointed at her face from five feet away" and "the threat perceived by [the officer] was further compounded" not only "by her close proximity to the rifle," but also by the "lack of a viable escape route," as "there was little space to maneuver and no obvious path for retreat"); *cf. also Pauly*, 874 F.3d at 1209 ("Given his cover [of a brick wall], the distance from the window [i.e., fifty feet], and the darkness, a reasonable jury could find that [the officer] was not in immediate fear for his safety or the safety of others.").

This factor should either weigh neutrally or weigh in Kevin's favor. Kevin is not taking cover or otherwise engaging in any effective preparation for a fight and multiple law enforcement officers have guns pointed at him from different angles. Force could effectively be used against Kevin before Kevin could actually harm any other person even in light of Kevin having a gun in the back of his waistband. Kevin not actually holding the gun in his hand comes into play in analyzing this factor. He would need to reach for his gun, free it from his waistband, aim, and fire. Meaning it would take Kevin more time to use force against officers than officers could respond against Kevin. In this case, Deputies Heredia and Bakar were close enough to be having a conversation with Kevin and were roughly 10 to 20 feet from him. Starr was 75 to 90 feet away from Kevin. Exhibit 5 at 90:1-16.

The fourth *Larsen* component is an evaluation of the "manifest intentions of the suspect." *Id.* Kevin never expressed any desire to harm the officers, himself or any other person. When Barkar was asked during his on-scene interview if Kevin had threatened him, Deputy Barkar replied, "No, he never threatened to hurt us or shoot us or anything like that." PF No. 23. Kevin can be heard on Deputy Heredia's belt tape four seconds before he is shot saying, "I am not going to hurt you." PF No. 9.  Kevin's manifest intentions were quite clear – he expressed them four seconds before he was shot and the expression of his manifest intention was fortunately preserved on an audio recording. Deputies Barkar, Heredia and Rivas all indicated that they did not feel threatened by Kevin. PF Nos. 7, 25, 31.

C.     *GRAHAM* FACTOR THREE

The third *Graham* factor concerns "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, 109 S.Ct. 1865. *Pauly v. White*, 874 F.3d 1197, 1221 (10th Cir. 2017)(internal citation omitted). In this case the law enforcement officers testified that they were not actually trying to arrest Mr. Torgerson. Logically, he cannot be resisting or evading an arrest that is not going to occur. This factor weighs heavily in Mr. Torgerson's favor.

In the event this Court construes the events leading up to Kevin being shot as a Fourth Amendment seizure, there is no evidence in the record that Kevin was attempting to flee from police in the moments leading up to when he was shot or at the moment he was shot. Likewise, there is no evidence in the record to suggest that Kevin was "actively resisting arrest" when he was shot or in the moments leading up to being shot. The record does not indicate any physical altercation occurring or other combative behavior occurring in the moments before Kevin is shot.

Looking at the totality of the circumstances from a reasonable officer's perspective, Kevin did not pose a threat of serious injury to any person when he was shot. Probable cause to use deadly

force against Kevin did not exist and his right to be free from excessive force under the Fourth Amendment was violated. Starr's actions were not objectively reasonable.

## VI.     *ESTATE OF TAYLOR* IS READILY DISTINGUISHABLE

Defense claims on page fourteen of their motion that the facts of *Estate of Taylor* are "almost identical to the present case." The cases are in fact materially different from one another at a fundamental level: evidence established that the Defendant in *Estate of Taylor* reasonably perceived a threat of serious bodily harm whereas the facts cannot support that Starr reasonably perceived a threat from Mr. Torgerson. In other words, unlike the present case, probable cause to use deadly force actually existed in *Estate of Taylor*. The cases are similar only in so far as both Starr and the officer Defendant in *Taylor* claimed to perceive that the suspect may fire a gun at someone. In *Estate of Taylor*, the Tenth Circuit determined that the officer defendant's perception was reasonable because of the weight of the evidence flatly contradicting the plaintiff's version of events:

> "Rather, even viewing the facts in the light most favorable to Plaintiffs, the record indicates that Mr. Taylor's hand gestures immediately before he was shot were consistent with drawing a gun against Officer Cruz or the other officers, see supra note 2—that is, his conduct reflected bad intentions. Furthermore, recall that Mr. Taylor's actions before this ultimate moment when Officer Cruz shot him likewise were not indicative of benign intentions. In particular, not only did Mr. Taylor ignore commands from the officers to stop and show his hands—he also verbally challenged them, saying things like, "What are you going to do? Come on, ... shoot me," and "Nah, fool." Aplts.' App. at 455–57, 551, 564."

*Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 771 (10th Cir. 2021). The Tenth Circuit and trial court in *Estate of Taylor* specifically relied on video evidence displaying the movement of the suspect's hands to make their factual finding. *Id*. No video exists in this case and the weight of the evidence in the present case clearly contradicts Starr's claim that he saw Kevin reach for and grab the handle of his gun. In the present case, the Plaintiff's facts must be adopted.

## VII.    <u>FAILURE TO WARN</u>

It is undisputed that Starr never gave Kevin a verbal warning that deadly force would be used prior to the shooting. PF No. 34. It has long been established that, where feasible, a warning should be given prior to using deadly force. *Thomson v. Salt Lake Cnty*, 584 F.3d 1304, 1321 (10th Cir.2009); see also *Samuel v. City of Broken Arrow*, 506 F. Appx 751, 754 (10th Cir. 2012) (quoting *Garner*, 471 U.S. at 12) (The Tenth Circuit has noted that "it is clear that 'some warning' must be given before an officer uses deadly force if 'feasible.'") Here, it was feasible for Starr to give a verbal warning and a reasonable officer under similar circumstances would have known that he was obligated to do so given the clear weight of authority and the fact that Starr made the decision to use lethal force several minutes in advance of actually using lethal force.

This is not a "close" case or "unusual case" with regard to Starr's obligation to provide a warning like the matter described in the *Pauly* case. Here, the undisputed facts establish that Starr had ample time and opportunity to warn that if he actually observed a hostile movement that he would shoot. Starr from a vantage point of 75 to 90 feet away from Mr. Torgerson decided that he would shoot Kevin if he saw him move for the gun and disengaged the safety on his rifle preparing to shoot Kevin. Deputy Starr waited at least three to five minutes with the express intention to shoot Kevin if he observed Kevin make a reach for his gun. At no point in time did Starr provide a warning to Kevin that lethal force would be used. Starr stated in a request for admission that he did not hear other law enforcement officers tell Kevin that lethal force would be used against him. PF No. 39.

Plaintiff's counsel did not locate a case where a defendant officer had minutes to provide a warning and did not do so. Starr's failure to warn is made more egregious given that he was positioned at least 75 to 90 feet away from Kevin while he had Kevin in the sights of a rifle. This

is an obvious case where a warning was feasible and should have been given. *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017).

### VIII.   <u>STARR'S USE OF FORCE VIOLATED CLEARLY ESTABLISHED LAW</u>

"For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011); see also *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); *Hope*, 536 U.S. at 739, 122 S.Ct. 2508 ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (internal quotation marks omitted)). The Supreme Court has noted that a case directly on point is not required to clearly establish law, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S.Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741, 131 S.Ct. 2074). The dispositive question is whether the violative nature of a particular conduct is clearly established and the inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Pauly v. White*, 874 F.3d 1197, 1222 (10th Cir. 2017)(internal citations omitted).

In the Fourth Amendment context, we have said that "because excessive force jurisprudence requires an all-things-considered inquiry with careful attention to the facts and circumstances of each particular case, there will almost never be a previously published opinion involving exactly the same circumstances. We cannot find qualified immunity whenever we find a new fact pattern." *Estate of Booker v. Gomez*, 745 F.3d 405, 427 (10th Cir. 2014)

*Walker* clearly establishes that officers are not entitled to qualified immunity when an officer unreasonably believes a suspect presents a threat to himself or other persons with a gun and

uses deadly force as a result of their unreasonable belief. *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006). Because Fourth Amendment cases are so fact specific, a block quote of the pertinent facts is provided rather than paraphrasing the facts:

> "We conclude that plaintiff's version of the facts presented on summary judgment support a claim of a violation of David Walker's Fourth Amendment right to be free from excessive force. Plaintiff's version of events suggests that Officer Peterson acted precipitously in shooting David, who posed a danger only to himself. The crimes at issue (theft of the vehicle, eluding the officers) were not particularly severe. David did not pose an immediate threat to the safety of the officers or others. He had made no threats and was not advancing on anyone with the small knife. He was holding the knife to his own wrist. While Officer Peterson stated that he believed David was pointing a gun at him, this belief was not reasonable, if plaintiff's version of events is accepted, and she is given the benefit of every reasonable inference. **The angle of David's hands and the amount of light on the scene should have permitted Officer Peterson to ascertain that he was not holding a gun in a shooting stance.** Finally, David was not actively resisting arrest, and there was no need to use deadly force to prevent him from fleeing and possibly harming others."

*Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006)(emphasis added).

Specifically at issue in *Walker* was the reasonableness of the officer defendant's claim that he had seen the suspect point a gun at him. *Id*. This is the same central fact issue present in the present case – whether Starr's claim that Kevin reached for his gun and grasped the handle is reasonable. The *Walker* court had in depth discussion about the lighting conditions at the place the shooting occurred to assess whether the officer defendant's ability to clearly observe the suspect, and going into such detail as to whether cloud cover diminished light provided by the stars and moon, "Although it was night time, there were several sources of light on the scene: the porch light, a large building light, the Subaru's two headlights on high beam,[13] the two officers' cars' lights, and the moon.[14] One witness described the scene as bright enough to read a book." *Id*. at 1157 (10th Cir. 2006). In the present case, the shooting took place during the day and Starr admitted that he had good visualization of the Plaintiff at the time he shot him. PF Nos. 36 and 37;

see also Exhibit 10. Starr specifically claimed in his deposition that he actually saw Kevin's hand on the handle of Kevin's firearm immediately before Starr shot Kevin. PF No. 33. Like the Defendant in *Walker,* Starr had excellent ability to actually observe the suspect's hands and make an accurate assessment as to whether or not the suspect was actually holding a gun. *Id*. at 1160.

In *Walker* The Tenth Circuit also had in depth discussion regarding the accounts of other witnesses at the scene that materially conflicted with the officer defendant's account of events, two witnesses specifically saw that the suspect was holding a knife and not holding a gun at the time the suspect was shot. *Id*. This is strikingly similar to the present case where the other witnesses on scene provide recollections of the event which materially contradicts Starr's claim that Kevin had actually grasped his firearm before Starr shot Kevin. The Walker court weighed the contradictory witness statements against the officer defendant's and relied on the contradictory statements in finding the officer defendant's claim to be unreasonable. *Id*. *Walker* addresses the same fact issues the Court must consider in this case. Consequently, in the present case the Court should make the same decision as the *Walker* court that the officer defendant's claims that would support the use of deadly force are not reasonable and deny the officer defendant qualified immunity. The specific facts at issue in the present case and *Walker* clearly define the applicable rule such that the rule's contours are so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11, 211 L. Ed. 2d 170 (2021)(internal citation and quotation omitted).

*Walker* remains binding legal precedent in the Tenth Circuit. *Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1071 (10th Cir. 2020)(S. Matheson concurring)(citing *Tenorio v. Pitzer*, 802 F.3d 1160, 1165-66 (10th Cir. 2015))("Walker held, under its facts, that officers can violate the Fourth Amendment by using force based on an unreasonable belief that a

suspect poses a deadly threat. *See Tenorio v. Pitzer*, 802 F.3d 1160, 1165-66 (10th Cir. 2015). But the Walker facts differ materially from [*Estate of Valverde by & through Padilla v. Dodge*]. In *Walker*, the brightly lit scene, the police radio information, and the family's telling police the son was unarmed contradicted any reasonable belief the plaintiff was about to shoot. By contrast, Sergeant Dodge's only pre-existing information was that Mr. Valverde had purchased drugs in the past and was potentially armed. App. at 206. Walker is too factually dissimilar to put a reasonable officer in Sergeant Dodge's position on notice that his conduct violated the Fourth Amendment. It does not "squarely govern[ ] the specific facts" here. *Kisela*, 138 S. Ct. at 1153").

The Defense will likely argue that *Walker* is too factually dissimilar to the instant case to squarely govern the facts presented due to the suspect in *Walker* having a knife on his person rather than a gun given that in the present case Kevin actually possessed a gun. This fact is of no consequence to the Court's qualified immunity analysis because the specific fact issues presented are the same in both the present case and *Walker*. Notably in *Estate of Valverde* the suspect possessed a gun and reached for his gun before he was shot. *Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1060 (10th Cir. 2020). The District Court and the Tenth Circuit both utilized the *Larsen* components to assesses whether probable cause existed to utilize deadly force in that case. *Id*. The Court did not hold that *Walker* or *Larsen* was inapplicable because the decedent in *Estate of Valverde* had a gun rather than a knife. The concurrence in *Estate of Valverde* actually discussed that *Walker* did not squarely govern the instant case because the facts at issue were sufficiently different and made no mention whatsoever that the suspect actually possessing a gun was a meaningful difference from the facts in *Walker*. *Estate of Valverde*, 967 F.3d 1049, 1071 (10th Cir. 2020)(S. Matheson concurring). Judge Matheson focused on the facts in both *Walker*

and *Estate of Valverde* that went to the objective reasonableness of the belief of the officer in each case that they had perceived a threat which justified the use of deadly force. *Id*.

The Tenth Circuit has also applied the *Larsen* framework to determine whether probable cause existed for an officer to use deadly force in *Pauly* in which the plaintiffs were both actually armed with firearms and *Estate of Taylor* in which the plaintiff was suspected of having a gun though he did not actually have a gun. The *Larsen* factors were derived from the Court's decision in *Walker*, "In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors... *See, e.g., Walker v. City of Orem, 451 F.3d 1139, 1159 (10th Cir.2006)."* Given the striking factual similarities on the material facts in dispute in *Walker* and the present case and the Tenth Circuit's repeated application of *Larsen* to cases involving suspects who either have guns or are suspected of having guns strongly indicates that it would be inappropriate to claim that *Walker* is distinguishable from the instant case because Kevin actually possessed a gun. Footnote 10 in *Estate of Taylor* is instructive on this point:

> This case is distinguishable from *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006). In *Walker* we determined that, under plaintiff's version of the facts, **"[t]he angle of [the suspect's] hands and the amount of light on the scene should have permitted [the officer] to ascertain that [the suspect] was not holding a gun in a shooting stance**." *Id*. at 1160. As shown above, that was not the case here. Mr. Taylor's hands were concealed for much of the encounter, and Officer Cruz had a split second to decide whether Mr. Taylor was complying with an order to show his hands or attempting to draw and use a weapon.

*Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 770 (10th Cir. 2021)(emphasis added).[1]

*Walker* consequently "squarely governs" the facts at issue in this case and puts beyond debate that it is clearly established law that under the specific facts of this case probable cause does not exist to use deadly force. In both *Walker* and the present case, the shooter had clear

---

[1] *Estate of Taylor* is further distinguished from the present case given that, in *Estate of Taylor,* the suspect's hands were concealed for "much of the encounter" whereas in the present case Kevin's hands were visible at the time the shooting occurred. PF No. 33.

visibility of the suspect, could see the suspect's hands, and made claims that the suspect engaged in hostile actions. In both *Walker* and the present case, the claims made by the officers that they observed hostile movements involving guns are patently unreasonable given the weight of evidence in the record that contradicts the respective officers' claims that the suspects in each case made a threatening move. Notably in both *Walker* and the present case eyewitnesses to the shootings both offer statements contrary to the statements provided by the shooters in each case.

Assuming arguendo that *Walker* does not squarely govern the facts in this case, the statements of law in *Walker* apply with obvious clarity to Starr's specific conduct in this case, so much so that Starr's actions clearly violate the law. *See Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 854 (D.N.M. 2020)('[G]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.' And this is so 'even though the very action in question has not previously been held unlawful.' ")(citing *A.N. by & through Ponder v. Syling*, 928 F.3d at 1198 (first quoting *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018), and then quoting *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

It is obvious that the Fourth Amendment permits an officer to use deadly force <u>only</u> if there is "probable cause to believe that there [is] a threat of serious physical harm to [the officer] or to others." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015)(citing *Estate of Larsen*, 511 F.3d at 1260)(emphasis in original). It is likewise obvious that "*Walker* held, under its facts, that officers can violate the Fourth Amendment by using force based on an unreasonable belief that a suspect poses a deadly threat." *Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1071 (10th Cir. 2020)(S. Matheson concurring)(citing *Tenorio v. Pitzer*, 802 F.3d 1160, 1165-66 (10th Cir. 2015)).

## IX.     PLAINTIFF HAS CREATED A MATERIAL ISSUE OF FACT ON HIS STATE TORT CLAIM

In New Mexico, showing that a touching is both unlawful and not privileged are essential elements of battery. To be clear, there is no analogue to qualified immunity in Tort Claims Act ("TCA") cases and the *Hernandez* case cited by the Defense states this clearly, "None of the cases cited by Defendants directly address the matter at hand: whether a plaintiff's failure to establish a Fourth Amendment claim for excessive force likewise establishes a defense for civil assault and battery claims brought under the TCA. The parties do not propose, and we do not adopt, a specific privilege as a defense to a civil claim of assault and battery brought against a police officer. Nevertheless, the traditional defenses for law enforcement to assert in response to civil assault and battery claims are not the same as the 'objectively reasonable officer' standard that is at the root of Fourth Amendment analysis… We therefore reject Defendants' suggestion that the federal court's determination that Sheriff Parker's actions were objectively reasonable under the Fourth Amendment is a complete defense to civil assault and battery." *Hernandez v. Parker*, No. A-1-CA-38635, 20-21, ¶ 32 (N.M. Ct. App. Feb. 1, 2022).

The facts discussed above create material issues of fact as to whether Starr needed to use force to prevent death or serious bodily harm to other persons which precludes dismissal.

## X.     CONCLUSION

10th Circuit precedent requires that the Plaintiff's facts must be adopted for consideration of this summary judgment motion. Plaintiff has raised material issues of fact in this matter which must be resolved in Plaintiff's favor on a motion to dismiss under qualified immunity. The record is clear that Starr's statement that he saw Kevin grab his gun is not a reasonable perception. *Walker* clearly establishes that the fact pattern present in this case violates Kevin's right to be free of excessive force. The Defendant's motion should be denied.

Respectfully submitted,

GORENCE LAW FIRM, LLC

*/s/  Robert Gorence*
Robert Gorence
300 Central Avenue SW, Suite 1000E
Albuquerque, NM 87102
505-244-0214 (telephone)
505-244-0888 (facsimile)
gorence@golaw.us

---and---

Jason Bowles
Bowles Law Firm
4811 Hardware Drive, Bldg. D, Suite 5
Albuquerque NM 87109
Phone:  (505) 217-2680
Fax:  (505) 217-2681
Email: bowles@bowles-lawfirm.com

---and---

Todd J. Bullion
4811 Hardware Drive, Bldg. D, Suite 5
Albuquerque NM 87109
(505) 452-7674
todd@bullionlaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I CERTIFY that on this 4th day of April 2022, I filed the foregoing through this Court's

CM/ECF System, and caused the following counsel of record to be served by electronic means,

as more fully reflected on the Notice of Electronic Filing:

Jonlyn Martinez
jonlyn@jmartinezlaw.net
*Attorney for Defendant Christopher Starr*

_/s/  Todd J. Bullion_
Todd J. Bullion