IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KEVIN TORGERSON,

     **Plaintiff,**

V.                                                                No. 1:21-cv-00204-DHU-LF

CHRISTOPHER STARR

     **Defendant,**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Christopher Starr's ("Defendant")

Motion for Summary Judgment Based in Part on Qualified Immunity.  Doc. 30 ("Motion").

Having considered the briefing, the record of the case, and the relevant and applicable law, the

Court finds there remain unresolved and disputed issues of material fact which preclude summary

judgment on the basis of qualified immunity as to two of Plaintiff Kevin Torgerson's ("Plaintiff")

constitutional claims and disputed issues of material fact which preclude summary judgment on

Plaintiff's state law claims, and therefore **DENIES** Defendant's Motion in part and **GRANTS** it

in part.

## I.
## FACTS

This case arises from the shooting of Plaintiff by Defendant Starr, a supervising deputy

with the Bernalillo County Sheriff's Office ("BCSO").  The following facts are either undisputed

or, where disputed, construed in the light most favorable to the Plaintiff as the nonmoving party

on summary judgement. *See Simms v. Okla. ex. rel. Dep't of Mental Health & Substance Abuse

Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999) (The Court must "view the evidence and draw

reasonable inferences therefrom in the light most favorable to the nonmoving party").  Moreover,

because this case involves the assertion of qualified immunity, where disputed, the Court adopts

Plaintiff's version of the facts for purposes of its analysis.  *See Emmett v. Armstrong*, 973 F.3d 1127, 1130 (10th Cir. 2020).

1.  On March 3, 2020, Plaintiff was involved in a single car accident near Carnuel, New Mexico.  (UMF 1).[1]

2.  After the accident, Plaintiff left the scene and began traveling on foot along Interstate 40. (UMF 2).  Bernalillo County Sheriff's Office deputies were dispatched to Plaintiff's reported location after receiving calls regarding Plaintiff walking along Interstate 40. (UMF 3).

3.  BCSO Deputy Matthew Volk approached the location and observed Plaintiff, who appeared unwilling to interact with law enforcement. (UMF 5).  Deputy Volk spoke with Plaintiff for a moment and soon after Plaintiff walked away from Deputy Volk, jumped over a fence, and continued to walk away. (UMF 6).  Deputy Volk then attempted to speak to Plaintiff again, at which time Plaintiff walked back towards Deputy Volk and jumped back over the fence. (UMF 7).

4.  Deputy Volk then noticed that Plaintiff had a firearm in his left hand, which he never raised from his side. (UMF 7; RUMF 2).  Deputy Volk drew his firearm and pointed it at Plaintiff stating, "Drop the gun or I'll shoot you," at which time Plaintiff put the gun in his waistband near the small of his back.  (RUMF 2, 6; PUF 43).

5.  During his encounter with Deputy Volk, Plaintiff never reached for the gun again or made any overt movement that led Deputy Volk to believe Plaintiff was presenting an imminent threat. (RUMF 2).

---

[1] "UMF" refers to the Undisputed Material Facts noted by Defendant in his Motion. Doc. 30. "RUMF" refers to Plaintiff's Responses to Defendant's Undisputed Facts, listed in Plaintiff's Response to Defendant Starr's Motion for Summary Judgment. Doc. 38. "PUF" refers to Plaintiff's Undisputed Facts, also listed in Plaintiff's Response.

6.   After placing his gun into his waistband, Plaintiff went back over the fence and again walked away from Deputy Volk.  (UMF 8).  Deputy Volk then transmitted his interaction with Plaintiff over the radio, including the fact that Plaintiff was in possession of a firearm.  (UMF 9).

7.   BCSO Deputy Micah Barkar then arrived on the scene in response to Deputy Volk's radio transmission and observed Plaintiff walking away from Deputy Volk. (UMF 10).

8.   Deputy Barkar then left Deputy Volk's location and headed toward an area where he believed Plaintiff was heading.  (RUMF 4).   When Deputy Barkar reached that area, he met up with another BCSO deputy, Deputy Miguel Rivas, and, shortly thereafter, BCSO Deputy Alejandra Heredia arrived on the scene. (UMF 12; RUMF 4).

9.   The BCSO deputies then attempted to speak with Plaintiff. (UMF 13).

10. Deputy Barkar and Heredia had their firearms pointed at Plaintiff, and Deputy Rivas had his rifle pointed at Plaintiff or in the low ready position.  (UMF 15).

11. During this interaction, the deputies made several demands of Plaintiff.  It is disputed as to whether or to what extent Plaintiff complied with the deputies' commands during the interaction between these three deputies and Plaintiff.[2]

---

[2] Citing to the deposition testimony of Deputy Barkar, Defendant states that "throughout the deputies' interaction with the Plaintiff, he refused to comply with their requests that he place his hands on his head and permit them to obtain his firearm."  Doc. 30 at 6 (UMF 16).   From the record cited by Defendant, it is not at all clear what was actually requested by the deputies as opposed to what they wanted Plaintiff to do and to what extent Plaintiff did or did not comply with commands.  The testimony from Deputy Barkar was the following:

> I wanted him to turn his back to us and go to his knees and put his hands on top of his head so that we could then move up to him and – and take the firearm.  He got to the point where he was turned away from us, his back was to us.  He put his hands on top of his head, the best I can recall but he didn't go to his knees, but then he took his hands back down from his head and had turned back to us. And that is when I started the dialogue of asking, what made you stop complying?

12. Defendant Starr, the deputies' sergeant, arrived at Plaintiff's location.

13. Defendant Starr observed Plaintiff walking away from Deputy Heredia and Deputy Barkar. At that time, he retrieved his rifle and trained it on Plaintiff.[3] Defendant Starr was 25 to 30 yards (75 to 90 feet) from Plaintiff. Doc. 1-2 (Compl. ¶¶18-19).

14. Defendant Starr had difficulty hearing the interaction between Plaintiff and the deputies due to the distance between him and the others. (RUMF 12).

15. Approximately 40 minutes elapsed in the interaction between Plaintiff and Deputies Heredia, Rivas, and Barkar. (RUMF 13). It is not clear from the record how long it was after Defendant Starr arrived until the time that he fired his rifle and shot Plaintiff.

16. Deputy Barkar told Plaintiff several times not to touch his gun, but Plaintiff was not reaching for his gun when these statements were made. (RUMF 14).

---

Doc. 30-4 at 54. Plaintiff disputes the contention that he was not compliant throughout the interaction with deputies, stating that he actually did place his hands on his head for some quantum of time and that he was complying with commands before he was shot. Doc. 38 at 6 (RUMF 8, 12).

[3] The Court notes its concern that Defendant's "Undisputed Material Facts" inaccurately characterizes deposition testimony in several key areas. For instance, the undisputed material fact regarding what Defendant Starr observed when he arrived at the scene does not appear to be consistent with the cited deposition testimony. Defendant's Undisputed Material Fact 18 states that "Defendant Starr observed that the Plaintiff was not cooperating with the deputies' instructions, and was in possession of a firearm, he retrieved his rifle from his trunk and positioned himself so that he could cover the deputies interacting with the Plaintiff." Doc. 30 at 6 (UMF 18). However, although there seems to be no dispute that Defendant Starr positioned himself so that he could cover the deputies, nowhere in the cited deposition testimony does Defendant Starr state that he observed Plaintiff not cooperating with deputies' instructions or even that he observed Plaintiff in the possession of a firearm at that time. Doc. 30-5 (Dep. at 45-48). Instead, throughout that part of his deposition testimony, Defendant Starr testified that he saw Plaintiff walking (not running) away from deputies, that he never saw Deputy Rivas with a rifle, and that, at the time he arrived at the scene, he did not see Plaintiff brandishing a firearm. *See id*.

17. At some point, Plaintiff asked the deputies if he could drop the gun and Deputy Barkar responded by telling him to not touch the gun, stating, "I do not want you to take the gun out of your waistband, for your safety and ours." (RUMF 14).

18. Plaintiff never threatened to shoot or otherwise hurt the deputies but expressed that he did not understand why the deputies wanted to take his gun as it was legally owned for his own self-defense. (PUF 25).

19. Deputy Barkar observed that Plaintiff's hands immediately before the shooting were both in the front pocket of his hoodie and that "he had taken those out and had them at his side near his waistband." (PUF 22).

20. At that point, Defendant Starr shot two rounds from his firearm, striking Plaintiff twice. (RUMF 15, PUF 22).

21. Seconds before the shooting, Deputy Heredia told Plaintiff to get his hands out of his pockets and then said, "Thank you," indicting that Plaintiff had complied. (PUF 9). She then told Plaintiff, "Kevin you were doing so good . . . just put your hands on the top of your head." *Id*. Plaintiff replied that he was not going to hurt the deputies and Deputy Heredia responded, "But I don't know that . . ." *Id*. She was interrupted mid-sentence by the sound of the gunfire from Deputy Starr. *See id*.

22. In the moments before he was shot, Plaintiff did not reach for his firearm. (PUF 44).

23. Defendant Starr did not provide any verbal warning to Plaintiff prior to the time he shot him. (Compl. ¶ 23; PUF 34).

## II.
## LEGAL STANDARDS

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED.

R. Civ. P. 56(a). "A fact is material if it can have an impact on the outcome of the lawsuit and genuine if a rational jury could find in favor of the non-moving party based on the evidence presented." *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171 (10th Cir. 2021) (internal citation omitted). In its evaluation, the court must construe the evidence in the light most favorable to Plaintiff as the nonmoving party. *See McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010); *Simms*, 165 F.3d at 1326.

However, "[b]ecause of the underlying purposes of qualified immunity, [the Tenth Circuit] review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). The onus is first on the plaintiff "to demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.*" Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (internal quotations and citation omitted). The first prong depends on whether the facts "taken in the light most favorable to the party asserting the injury show the officer's conduct violated a federal right." *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (internal citation and punctuation omitted); *Walker v. City of Orem*, 451 F.3d 1139, 1145 (10th Cir. 2006) (explaining that the threshold inquiry in the qualified immunity analysis is whether, taking a plaintiff's allegations as true, the officer in question violated the plaintiff's constitutional rights). The second prong requires that preexisting Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, makes it apparent to a reasonable officer that the nature of his conduct is unlawful. *See Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017). A case need not be directly on point for a right

to be clearly established because fact-to-fact comparison is not required when distinctions in the facts make no constitutional difference. *See Kerns v. Bader*, 663 F.3d 1173, 1186-87 (10th Cir. 2011). Instead, all that is required is "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal citation omitted).

If a "plaintiff successfully carries his two-part burden," the "defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996); *see also Pueblo Neighborhood Health Cntrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988). "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied." *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (internal quotations and citation omitted).

## III.
## DISCUSSION

Plaintiff alleges that Defendant Starr violated his clearly established rights secured under the Fourth and Fourteenth Amendments by: 1) using excessive force against Plaintiff; 2) failing to warn Plaintiff before using deadly force; and 3) using force on a subdued person. Doc. 1-2 at ¶¶ 37-44, 51-56, 65-71. Plaintiff also brings state law claims against Defendant Starr pursuant to the New Mexico Tort Claims (NMTCA), which waives governmental immunity for injuries resulting from, among other things, assault and battery committed by law enforcement officers. *See id.* at ¶¶ 77-85; N.M. STAT. ANN. §41-4-12 (1978). Through the instant motion for summary judgment, Defendant Starr asserts the defense of qualified immunity as to each of the constitutional claims. Doc. 30 at 9-17. According to Defendant, in evaluating his asserted qualified immunity defense,

the Court should not take Plaintiff's allegations as true because they are clearly contradicted by the record. *See id*. at 9. Moreover, Defendant argues that he is entitled to summary judgment on Plaintiff's state law clams. *See id*. at 17-18.

**A**. **DEFENDANT'S ARGUMENT THAT THE FACTS SHOULD NOT BE TAKEN IN THE LIGHT MOST FAVORABLE TO PLAINTIFF IS WITHOUT MERIT.**

Defendant first argues that the Court should reject Plaintiff's stated version of the facts because they are clearly contradicted by the record. More specifically, Defendant focuses on statements made by Plaintiff while he was being questioned by police several days after the shooting which, according to Defendant, confirm Plaintiff was reaching for his gun when Defendant Starr used deadly force against him. Defendant provides a transcript of the Plaintiff's interview by detectives which shows that, in response to questioning by a detective, Plaintiff stated, "I guess eventually I just went for it to put it down. Not in a hostile, like draw way. And then they just all shot me. . . It was probably aggressive looking I know." Doc. 30-8 at 6. Because of this statement, argues Defendant, it cannot be disputed that Plaintiff attempted to grab his gun before Defendant shot him and Plaintiff's current allegations to the contrary should be discounted.

Plaintiff disagrees and takes the position that Tenth Circuit law requires this Court to take the facts in the light most favorable to him, rejecting the idea that this case involves a situation where the record blatantly and clearly contradicts Plaintiff's version of events. Plaintiff points out that any responses he provided when questioned by two detectives several days after being shot by Defendant are "grossly unreliable." Doc. 38 at 17. According to Plaintiff, that questioning occurred while he was in a "drug induced stupor" lying on a hospital bed recovering from major life saving surgery. *Id.* Due to his condition on that day, Plaintiff asserts that when he spoke to the law enforcement officers, he only speculated that he must have done something to have been shot and guessed that he must have gone to put his gun down. *Id*. Moreover, asserts Plaintiff, the

record supports his position that the hospital bed statements are unreliable because other officers at the scene testified that Plaintiff did not reach for or touch his gun. *See id.* at 18.

    **1.**  **The Decisions in *Scott*, *Durastanti*, and *Armstrong*.**

        In arguing that Plaintiff's version of events should not be given weight, Defendant cites to and relies on the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007), and the Tenth Circuit's opinions in *Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010) and *Armstrong*, 973 F.3d at 1127.  In *Scott*, plaintiff-motorist brought an action under 42 U.S.C. § 1983 against a county deputy and others alleging that the deputy used excessive force during a high-speed vehicle chase in violation of his Fourth Amendment rights.  550 U.S. at 374-376.  The county deputy attempted to pull plaintiff's vehicle over after he clocked it traveling almost 20 miles over the speed limit but, rather than stopping, the plaintiff sped away and the deputy pursued him.  *Id.* at 374-75.  The deputy then maneuvered his vehicle and caused it to hit plaintiff's vehicle, resulting in the plaintiff's vehicle leaving the roadway, running down an embankment and overturning. The accident caused serious injury to the plaintiff and rendered him a quadriplegic. *Id.* at 375.  In his lawsuit, the plaintiff argued that the officer's actions constituted excessive deadly force because, under plaintiff's version of events, they were not reasonable.  The plaintiff claimed that, during the pursuit, he was always in control of his vehicle, slowed for turns and intersections, and used his indicators for turns.  *Id.* at 379.  The plaintiff further contended that he did not run any motorists off the road, nor was he a threat to pedestrians.  These facts were taken as true for the purpose of analyzing the deputy's qualified immunity defense by both the district court and the Eleventh Circuit Court of Appeals, which concluded that the deputy was not entitled to qualified immunity because his actions in running the plaintiff off the road under such circumstances were unreasonable. *Id.* at 376.

The United States Supreme Court, however, reversed that determination, finding that the deputy was entitled to qualified immunity because his actions were reasonable and thus did not violate the Fourth Amendment.  *Id*. at 382.  The Court recognized and affirmed that courts are required to view the facts and draw reasonable inference in the light most favorable to the party opposing summary judgment and that, in qualified immunity cases, this ordinarily meant adopting as true the plaintiff's version of the facts.  *Id*. at 378.  However, noted the Court, there was "an added wrinkle in th[e] case: existence in the record of a videotape capturing the events in question" which "quite clearly contradict[ed] the version of the story told by [the plaintiff]." *Id*.  For instance, contrary to the plaintiff's assertion that he was driving safely at all times, the videotape told "quite a different story."  *Id*. at 379.  The video recording of the events as they occurred were described by the Court in detail:

> [W]e see respondent's vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast.  We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit.  We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up.  Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.

*Id*. at 379-80.  Given the videotape recording of the incident in question, the Court concluded that the plaintiff's version of events was so "utterly discredited by the record that no reasonable jury could have believed him."  *Id.*  at 380.  Thus, determined the Court, the lower courts should not have relied solely on plaintiff's version of the facts and should have also considered the facts in the light depicted by the videotape.  *Id.* at 380-81.

In *Durastanti*, decided three years after *Scott*, the Tenth Circuit faced a similar case involving a recording of contested events. 607 F.3d at 655.  In that case, the plaintiff brought a § 1983 claim against the defendant, an agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), after the defendant ATF agent shot and injured the plaintiff.  The plaintiff and two other individuals were in a vehicle that had been followed by law enforcement after being observed to have sped away from a high-crime area.  *Id.* at 659.  The vehicle, a Lincoln, turned into the parking lot of a convenience store so that one of the occupants could use the restroom and buy cigarettes.  *Id*. at 660.  State police and ATF agents then entered the parking lot and one of the state troopers activated his lights.  Two ATF agents, including the defendant, approached the Lincoln on foot with guns drawn.  It was undisputed that the agents never identified themselves as law enforcement.  *Id*.  The plaintiff and the other two occupants of the Lincoln feared that the two men intended to rob or otherwise harm them.  *Id*. at 661.  In an effort to get away, the driver of the Lincoln attempted to maneuver around the vehicle that the ATF agents had arrived in and the defendant fired several shots at the driver, testifying later that the Lincoln was coming directly at him and his objective was to stop the Lincoln.  *Id.*  The Lincoln continued out of the parking lot, hitting the defendant, who rolled off its hood, landed on his feet, and fired two more shots at the back of the Lincoln.  During the incident, the plaintiff was shot in the leg.  *Id.*

The issue in *Durastanti* was whether the defendant ATF agent acted unreasonably in using deadly force and firing at the Lincoln as it was leaving the parking lot.  The plaintiff argued that the use of deadly force was excessive because witnesses claimed that the Lincoln slowed and perhaps even stopped, making it unnecessary and unreasonable to open fire on its occupants.  *Id.* at 664.  The defendant, however, testified that the Lincoln was accelerating towards him, he had

no way to escape, and there was only a short period of time for him to react.  In light of this situation, argued the defendant, he reasonably chose to exercise deadly force.  *Id.*

The district court rejected the defendant's qualified immunity defense, finding that there were disputed issues of fact concerning the events that led to the defendant's decision to fire his weapon at the Lincoln.  The Tenth Circuit, however, reversed, citing to *Scott* and noting that plaintiff's contention that the Lincoln was slowing down was clearly contradicted by a videotape recording of the moment when the Lincoln was attempting to leave the parking lot.  *Id.*  Contrary to the plaintiff's assertion, the video recording showed that the Lincoln was not slowing down, was in close proximity to the ATF agents, was on a path towards the defendant, and all of this took place in a very short amount of time.  *Id.*. at 664-65.  The Tenth Circuit thus determined, in accordance with *Scott*, that it was appropriate to consider the video recording as well as the plaintiff's version of events because the video resolved certain material disputes identified by the district court regarding the challenged incident.  *Id.* at 665.  The Court then explained that, "[a]lthough the district court concluded that Agent Durastanti's position when he fired the second two shots was a disputed material fact, this fact cannot be disputed because Agent Durastanti's position at that time is clearly shown on the video."  *Id.* at 666 (citing *Scott*, 550 U.S. at 379).

Most recently, in *Armstrong*, the Tenth Circuit reviewed a case involving the seizure and tasing of a plaintiff by a police officer in the parking lot outside of a wedding reception.  973 F.3d at 1127.  The issue relevant to the plaintiff's § 1983 excessive force claim against the officer was whether it was objectively reasonable for the police officer to have deployed his taser after he had seized plaintiff by tackling him to the ground.  *Id.* at 1134-35.  Under the plaintiff's version of events, the officer tackled him, then stood over him as the plaintiff laid on his back, not resisting or attempting to flee.  *Id.* at 1135.  The Tenth Circuit reviewed a videotape recording of the tasing

taken from a body camera worn by the officer. *Id.* The court noted that the Supreme Court's decision in *Scott* counseled that "a video record of an event may be considered at the summary judgment stage only if it 'blatantly contradict[s]' the other proper evidence at summary judgment." *Id.* at 1135 (quoting *Scott*, 550 U.S. at 380). In the case before the court, however, the video footage did not "blatantly contradict" the plaintiff's version of the events and in fact could be interpreted to corroborate it. *Id.* Thus, the district court was required to accept plaintiff's version of the facts corroborated by a reasonable interpretation of the video. *See id.*

2. **The Cases Relied on by Defendant and the Circumstances of This Case Do Not Require or Even Allow This Court to Reject Plaintiff's Version of the Facts**.

Defendant's argument that *Scott*, *Durastanti*, and *Armstrong* support his contention that Plaintiff's recitation of the facts leading up to the shooting should be ignored, is misplaced. In each of these cases, the deciding court affirmed the general rule that in considering summary judgment motions courts must view the evidence and all inferences arising from that evidence in the light most favorable to the nonmoving party, which in motions involving qualified immunity meant adopting the plaintiff's version of the facts. *See Armstrong*, 973 F.3d at 1130 (citing *Scott*, 550 U.S. at 378); *Durastanti*, 607 F.3d at 659. It is true that these cases also recognize that, in cases where evidence depicting the challenged incident indisputably and blatantly contradict the plaintiff's version of events, courts can rely on that evidence to determine the facts it would consider on summary judgment. The substantive difference, however, between the evidence presented in *Scott*, *Durastanti*, and *Armstrong*, and the evidence present in the instant case, is that the evidence in those three cases consisted of videotape recordings of the actual conduct that was challenged as being unconstitutional. In *Scott*, the video evidence depicted the manner in which the plaintiff was driving and the moment the county deputy maneuvered his vehicle to drive the plaintiff off the road, 550 U.S. at 379-80; in *Durastanti*, the video evidence showed the moment

the Lincoln attempted to drive out of the parking lot at high speed and in the direction of the defendant ATF agent, 607 F.3d at 664-65; and in *Armstrong* the video evidence depicted the moments leading up to and including the tasing of the plaintiff, 973 F.3d at 1135.

In this case, there is no videotape recording of the moment Defendant Starr shot Plaintiff or any of the events that led up to the shooting. Unlike the cases relied on by Defendant, there is no opportunity for this Court or a jury to view a video of the challenged incident – in this case, the shooting – to determine whether Plaintiff's version should be in any way discounted.[4] Despite Defendant's arguments to the contrary, the statements Plaintiff made to law enforcement officers a week after he was shot do not amount to the same type of evidence considered in *Scott*, *Durastanti*, or *Armstrong*. Not only are the statements not actual recordings of the incident in question, but the Court agrees there is sufficient evidence from which a jury could find those statements to be unreliable. As Plaintiff points out, the interrogation by a detective from the Bernalillo County Sheriff's Office and a detective from the Albuquerque Police Department was conducted while he lay in a hospital bed recovering from major surgery necessitated by the injuries he received because of the shooting by Defendant Starr. Plaintiff contends that, at the time, he was under the influence of significant pain medication, including morphine, and Defendant has provided no evidence or argument to the contrary. A videotape recording and transcript of the interrogation show that the detectives woke Plaintiff in order to speak with him (without a lawyer present) and throughout the interaction, as Plaintiff laid on his hospital bed, he appeared groggy and unsteady, speaking most of the time with his eyes closed or half-closed, often grimacing in

---

[4] There is, however, an audio recording of the moments before and during the shooting, but rather than providing indisputable proof that Plaintiff's version is incorrect, the audio recording, like the video recording in *Armstrong*, may actually corroborate Plaintiff's version because it indicates that Plaintiff was shot as Deputy Heredia was speaking to him and just after he stated that he was not going to hurt anyone. (PUF 9).

pain. Doc. 38, Ex. 11. In addition to mumbling the statement that he "guessed" he must have "went for it to put it down," Plaintiff also responded in a way that indicated he was unsure whether he had crashed his car; did not know it was a single car accident; and did not know whether anyone else was hurt. Doc. 30-8 at 1.

Later, when Plaintiff was no longer recovering from surgery or under the influence of any drugs or medication, he swore under oath that he did not attempt to go for his gun and explained that he believed the officers who interviewed him at his hospital bed, when he was "morphined out of [his] head," took advantage of the situation and effectively coerced him into saying what they wanted him to say. Doc. 38-6 (Torgerson Dep. at 64:10-65:11).[5] The Court makes no determination whether Plaintiff was coerced by law enforcement, but does find there is sufficient evidence from which a reasonable jury could agree with Plaintiff that the statements he made to law enforcement officers cannot be credited given his condition at the time and given the other evidence in this case which calls into question the assertion that he reached for and grabbed his gun, including the testimony of the other officers on the scene of the shooting who did not see Plaintiff do so.[6]

In sum, after considering all the evidence presented by the parties, including the statements made by Plaintiff at the hospital, the Court disagrees that the holdings in *Scott*, *Durastanti,* and *Armstrong* require the rejection of Plaintiff's stated facts. More specifically, the Court finds that Plaintiff's version of events is not so "utterly discredited by the record that no reasonable jury could [believe them]." *Scott*, 550 U.S. at 380. The Court will thus adhere to the long-standing

---

[5] Citations to deposition testimony begin with page number, then enumerated lines where the testimony can be found. As an example, Torgerson Dep. at 64:10-65:11 refers to the cited deposition testimony of Plaintiff Torgerson at page 64, line 10 through page 65, line 11.

[6] *See* discussion and citations to the record *infra* Section III.B.1.(a)(ii).

precedent which requires the Court to view the evidence in the light most favorable to Plaintiff and, where disputed, take Plaintiff's allegations as true.

## B.    DEFENDANT'S ASSERTION OF QUALIFIED IMMUNITY

Having determined that Plaintiff's version of events should be taken as true for purposes of analyzing Defendant's defense of qualified immunity, the Court now considers whether under those facts (1) the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) whether that right was clearly established at the time of the defendant's unlawful conduct. *See Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013).

### 1.  Defendant Starr is Not Entitled to Qualified Immunity on Plaintiff's First Claim for Relief in His Complaint.

#### a)  The shooting of Plaintiff by Defendant.

Defendant Starr first moves for summary judgment on part of Plaintiff's first claim for relief in his Complaint.  Through this first claim for relief, Plaintiff alleges that the "facts and circumstances known to law enforcement did not justify holding him at gunpoint for half an hour prior to shooting him," and that the ensuing "use of deadly force was not reasonable under the circumstances and was excessive under the Fourth and Fourteenth Amendments."  Doc.1-2 at ¶¶ 43, 44.[7]

Federal courts evaluate excessive force claims under an "objective reasonableness" standard, judged from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *see also Pauly v. White*, 874 F.3d 1197 (10th Cir. 2017). In conducting

---

[7] Although Defendant states that he is moving for summary judgment on this count of Plaintiff's Complaint, he makes no argument concerning what Plaintiff alleges was his unconstitutional prolonged detention by officers prior to the shooting.  The Court will thus not grant summary judgment on that claim and will address only Defendant's assertion that he is entitled to qualified immunity on Plaintiff's excessive force claim.

that analysis, the Court "focuses not on the officers' particular motivations, nor on the arrestee's perception of the intrusion, but on whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (internal citation omitted).  Reasonableness is evaluated under the totality of the circumstances and includes the consideration of the following factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

### i. *Severity of the crime at issue*

In his Motion, Defendant Starr does not address or make any argument concerning the factors to be considered under the Supreme Court's decision in *Graham*.  The limited arguments raised by Defendant concerning the *Graham* factors are instead raised for the first time in Defendant's reply where Defendant asserts that, as to the severity of the crime at issue, Plaintiff may have been committing the crimes of negligent use of a deadly weapon, concealing identity, and the unlawful carrying of a deadly weapon at the time he was shot.  Doc. 44 at 6.[8]

Plaintiff, on the other hand, argues that the "the severity of the crime at issue" factor weighs against the use of anything but minimal force in this case. *Graham*, 490 U.S. at 396-97.  According to Plaintiff, none of the officers at the scene testified that they believed Plaintiff was committing a

---

[8] It is troublesome that Defendant reserved much of his substantive arguments for his reply, given that Plaintiff did not have an opportunity to respond to those arguments in writing.  Such belated arguments are ordinarily deemed waived. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."). However, the Court will not strike the arguments made for the first time in Defendant's reply because it held a hearing at which the parties had the opportunity to fully present their respective positions.  Doc. 51.

crime at anytime during their interaction with him.  Because the deputies did not have reason to believe a crime had been committed or that Plaintiff was actively engaging in a crime, the first *Graham* factor falls in his favor.

The Court rejects Defendant's claim that Plaintiff was actively engaging in criminal behavior at the time Defendant fired his rifle from a distance and shot Plaintiff. While Defendant identifies, again for the first time in his reply brief, three state crimes he believes Plaintiff committed or was committing, this appears to be a post-hoc consideration not related to what any of the deputies or Defendant himself believed on March 3, 2020.  Plaintiff has cited to testimony from Deputy Heredia, Deputy Barkar, and Deputy Rivas, which indicates that none of these officers could identify a crime they suspected Plaintiff had committed or was committing at the time they encountered him.  Doc. 38-2 (Heredia Dep. at 12:11-15; 14:17-15:2; 15:13-21; 16:11-16); Doc. 38-3 (Barkar Dep. at 39:13-19; 41:7-10); Doc. 38-4 (Rivas Dep. at 15:3-14).  Also, even if there was evidence that the officers on the scene suspected Plaintiff of committing the three crimes now identified by Defendant, each of the cited infractions amount to petty misdemeanors under state law and would not justify the use of deadly force against Plaintiff.  *See* N.M. STAT. ANN. § 30-7-4(C) (1978); N.M. STAT. ANN § 30-7-2(C) (1978); N.M. STAT. ANN § 30-22-3 (1978). The Court finds the "severity of the crime" prong weighs heavily in favor of Plaintiff.

ii.    *Immediate threat to safety of officers or others.*

The second *Graham* factor, "whether the suspect posed an immediate threat to the safety of officers or others[,] is the most important factor in determining the objective reasonableness of an officer's use of force." *Pauly,* 874 F.3d at 1215-16.   In evaluating this factor, the Court "must look at whether officers [or others] were in danger at the precise moment that they used force." *Armstrong*, 973 F.3d at 1136 (internal citation omitted).  "Deadly force is justified under the Fourth

Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Sevier v. City of Lawrence*, 60 F.3d 695, 600 (10th Cir. 1995).

In assessing the degree of threat facing officers, the Court must consider a number of non-exclusive factors. *See Estate of Larson ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2017). The *Larsen* factors include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and suspect; and (4) the manifest intentions of the suspect. *Id.*

### 1. First *Larsen* factor

The first factor to consider under *Larsen* is whether the officers ordered Plaintiff to drop his weapon and the extent of Plaintiff's compliance with those commands. *See id.* Once again, Defendant did not address the factors set forth in *Larsen* and how they might apply to this case until his reply brief. There, Defendant argues that under the first *Larsen* factor he was justified in using deadly force because Plaintiff was in possession of a firearm and deputies were pointing their guns at him. Doc. 44 at 21. Defendant states that deputies told Plaintiff to put his hands on his head, to get on his knees, and not to touch his gun, and that Plaintiff failed to comply with these orders, instead reaching for his weapon. *See id.*

Plaintiff argues that the first *Larsen* factor is not applicable here and, if it was, it weighs in his favor because, at the time Defendant Starr shot him, he was not holding a firearm or any other type of weapon. Doc. 38 at 22. Plaintiff contends that, "[a]s a matter of common sense a suspect who is not actually holding a weapon poses substantially less risk than a suspect who has a weapon in hand ready to use." *Id.* Plaintiff also argues that he never reached for his gun, was complying

with commands, had taken his hands from his hoodie front pocket, and was talking calmly with the deputies near him at the time he was shot by Defendant.

The Court agrees with Plaintiff that the first factor in *Larsen* is not entirely applicable here because Plaintiff was not holding a weapon at the time he was shot by Defendant. There is also no dispute that none of the deputies told him to drop his weapon, again, because he was not holding one. Rather, the orders repeatedly provided to him by the deputies who were closest to him were for him not to reach for the firearm. Defendant Starr claims that Plaintiff was reaching for his gun and had grabbed its handle, but even this paints a different scenario than the situation in *Larsen*. In that case, the person shot by police was holding a large knife in his hand, was positioned only seven to twelve feet from police officers, did not comply with orders to drop the weapon, and then suddenly raised the knife above his shoulder with the blade pointed outward and turned towards a police officer. *Larsen*, 511 F.3d at 1258-59. While the Court recognizes that there may be no substantive difference between failing to drop a weapon after being commanded to do so and reaching for a weapon when ordered not to, given the circumstances of this case the first factor under *Larsen* is largely inapplicable because, viewing the evidence in the light most favorable to Plaintiff, he was not holding or reaching for a weapon at the time he was shot.

2. Second *Larsen* factor

The second factor under *Larsen* is whether Plaintiff made any hostile motions with a weapon towards police officers. *Larsen*, 511 F.3d at 1260. According to Defendant, at one point during his encounter with officers, Plaintiff put his hands on his head and Defendant heard one of the officers say something to the effect of "Don't touch that gun." Doc. 38-5 at 10 (Dep. at 92:24 through 93:4). Plaintiff then "quickly reache[d] back and grab[bed] the gun, acquiring a firing-

type grip on the handle," at which time Defendant Starr fired his first round. *Id.* (Dep. at 93: 22-24).

But Plaintiff denies that he ever reached for and grabbed his gun, a contention that has support in the testimony of officers who were closest to him. Deputy Barkar, for instance, testified that he could plainly see the firearm in Plaintiff's waistband on the small of his back during much of the interaction with him, but did not at any point see him reach for his gun. Doc. 38-3 at 6 -7 (Barkar Dep. at 51, 55). As explained by Deputy Barkar, "Had he (Plaintiff) reached for the firearm, I would have used deadly force against him – had I observed it." Doc. 38-3 at 6 (Barkar Dep. at 51:13-15). Deputy Rivas also denied that he ever saw Plaintiff grab his gun, as stated by Defendant, and did not believe that he had to use deadly force against Plaintiff. Doc. 38-4 at 6 (Rivas Dep. at 88:8-19). Deputy Heredia testified that at one point she saw Plaintiff move his hand toward the firearm, but that she, like Deputy Barkar and Deputy Rivas, never felt that her life was in danger at any time during her interaction with Plaintiff. Doc. 38-2 at 5, 7, (Heredia Dep. at 22:8-19; 35:20-23). Across the testimony, none of the deputies closest to Plaintiff confirmed that he reached back and grabbed the handle of the gun as stated by Defendant Starr and none of these officers testified that they reasonably believed they needed to use deadly force against Plaintiff at any time.[9]

---

[9] In *Larsen*, the reasonableness of the officer's actions was supported by the fact that the other officer on the scene "stated that he too was prepared to use force at the time of the shooting and was maneuvering into position when [the defendant in that case] fired." *Larsen*, 511 F.3d at 1258-59. In this case, however, Defendant Starr took an action that none of the other deputies who were closest to him believed was warranted at the time.

The Court finds that there are significant and genuine disputed issues of fact regarding whether Plaintiff made any hostile motions with a weapon towards police officers which constituted an immediate threat to their safety. *Se*e, *e.g*., *Beauford*, 35 F.4th at 1262.

### 3. Third *Larsen* factor

The third *Larsen* factor to consider in determining the degree of threat facing officers is the distance between them and Plaintiff at the time of the use of deadly force. *Larsen*, 511 F.3d at 1260. This factor assesses the immediacy of perceived threats based on distance, the effective range of the weapon at issue, the officer's ability to defend themselves or find cover, and the time it would take a perceived threat to manifest. *See, e.g*., *Tenorio v. Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015) (affirming that the third *Larsen* factor weighed against officer because, even though suspect was walking towards him armed with a knife, the officer shot the suspect "before he was within striking distance of [the officer].")*; Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 770 (10th Cir. 2021) ("The short distance separating Mr. Taylor and Officer Cruz [10 to 12 feet], compounded by the absence of immediately accessible cover that Officer Cruz could use to avoid potential harm, causes this third factor to weigh in Defendants' favor."); *Pauly*, 874 F.3d at 1218 (third *Larsen* factor weighed against officer who shot decedent because officer was 50 feet away and was sequestered behind a rock wall).

In this case, Defendant Starr testified that he was 25 to 30 yards (75 to 90 feet) away from Plaintiff when he fired his weapon. Doc. 38-5 at 10 (Dep. at 90:16). This is greater than a distance of 50 feet, which in *Pauly* was found to skew the third *Larsen* factor *against* the shooting officer. *See Pauly*, 874 F.3d at 1218. However, in this case, Defendant Starr claims that the reason he decided to use deadly force was not to protect himself but rather to address what he perceived to be an immediate threat to the deputies who were communicating with Plaintiff from "a short

distance away." Doc. 38-5 at 12 (Dep. 94:3-9). Although Defendant does not provide any further estimations on the distance between Plaintiff and the other deputies at the time he fired his rifle, Plaintiff states that throughout the interaction the distance between him and the three deputies closest to him varied from 10 feet (3.3 yards) to 75 feet (25 yards). Doc. 38 at 2. Plaintiff, however, like Defendant, does not provide further specificity as to how close he was from the deputies he was interacting with at the precise time he was shot. *See id*. The Court is mindful that the weapon at issue in this case is a handgun, which can certainly be more dangerous than other weapons, like the knife wielded by the decedent in *Tenorio*, and that the "striking distance" of such a weapon differs significantly from that of a bladed weapon. However, without more than the estimates provided here, which could put the distance between Plaintiff and the officers Defendant states he was protecting anywhere from 10 feet to 75 feet, the Court cannot fully analyze the third *Larsen* factor and therefore finds this factor to be neutral.

### 4. Fourth *Larsen* factor

The last *Larsen* factor requires the consideration of the manifest intentions of Plaintiff. *Larsen*, 511 F.3d at 1260. Again, Defendant does not specifically address this factor in his motion, but states in his reply that Plaintiff took a "bladed stance" and reached for his gun. Doc. 44 at 21. Plaintiff maintains that that this factor weighs in his favor because he never expressed a desire or intention to harm the deputies, himself, or any other person. Doc. 38 at 26.

The Court finds that nothing in the record indicates that Plaintiff manifested an intention to cause harm to anyone during his interaction with deputies, other than Defendant's assertion that Plaintiff reached for and grabbed the handle of his gun – which no other officer saw and which the Court has already determined a reasonable jury could find otherwise. As to the "bladed stance," taken by Plaintiff, the Court notes that this was not something Defendant Starr observed, but rather

a description given by another deputy during his deposition and so does not go to the reasonableness of Defendant Starr's actions. Further, this case is different from cases like *Taylor*, where the decedent was shot by police after he, among other things, verbally challenged officers and said things like, "What are you going to do?  Come on, …shoot me." *Taylor*, 16 F.4th at 750. Or the situation in *Larsen*, where the suspect took steps and advanced towards the shooting officer while he was holding a knife and was only several feet away from the officer.  *Larsen*, 511 F.3d at 1260-61.  Here, there is no evidence that Plaintiff ever challenged the deputies who had confronted him and/or indicated to them that he intended to harm them or himself.  Instead, Deputy Barkar testified, "No, he never threatened to hurt us or shoot us or anything like that.  He just didn't understand why we wanted to take his gun, he said it was a legally owned gun for his own self-defense." PUF 25.   More important for this analysis, Defendant Starr testified that due to the distance between him and Plaintiff, he could only hear a "word here and there," but never heard Plaintiff make any threats to the officers who were speaking with him.  Doc. 38-5 at 8 (Dep. 85:23-86:2).

The Court finds that the final *Larsen* factor weighs in favor of Plaintiff.

       iii.    *Whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight.*

Under *Graham*, the Court next considers whether there is any indication that Plaintiff was actively resisting arrest or attempting to evade arrest at the time Defendant decided to use deadly force. *Graham*, 490 U.S. at 396. Defendant says nothing about this factor. Plaintiff, however, argues that there is no evidence, in the form of testimony or otherwise, that indicates Plaintiff was attempting to flee from police in the moments leading up to when he was shot. Doc. 38 at 26. Likewise, argues Plaintiff, there is no evidence in the record to suggest that he was actively resisting arrest at any time. *Id*. The Court agrees with Plaintiff and finds no evidence that the officers at the scene were attempting to arrest Plaintiff at any time before or at the time he was shot by Defendant Starr, so it cannot be said that Plaintiff resisted or attempted to evade arrest. At most, these officers may have arguably been engaged in their "community caretaking" capacity, attempting to determine whether Plaintiff needed assistance. *See United States v. Purvis*, 663 F. Supp. 3d 1233, 1248 (D.N.M. 2023) ("The community caretaker principle allows law enforcement officers to effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need to assure the safety of the public and/or the individual.") (internal quotations and citation omitted). But the Court questions whether that function would have justified the continued detention of Plaintiff since none of the officers testified they had reasonable suspicion to justify such an extended seizure. The third *Graham* factor weighs in Plaintiff's favor.

    **b) Considering the *Graham* and *Larsen* factors, there are disputed issues of fact concerning the objective reasonableness of Defendant Starr's actions.**

Considering the evidence of record and viewing the evidence in the light most favorable to Plaintiff, the Court finds that the *Larsen* factors weigh against Defendant and in favor of Plaintiff

when assessing the degree of threat facing the officers closest to Plaintiff at the time Defendant Starr decided to fire his weapon.  The Court also determines that an analysis of the factors set forth in *Graham* lead to the conclusion that a jury could find that Defendant Starr's actions were not objectively reasonable in light of the facts and circumstances confronting him, and that Defendant's shooting of Plaintiff constituted excessive force and a violation of Plaintiff's Fourth and Fourteenth Amendment rights.

Defendant relies heavily on two cases for the proposition that his decision to shoot Plaintiff was objectively reasonable and did not violate Plaintiff's constitutional rights – *Taylor*, 16 F.4th 744,  and *City of Tahlequah v. Bond*, 595 U.S. 9 (2021).  In *Taylor*, the Tenth Circuit considered an appeal involving the death of Dillon Taylor, a man who was shot and killed by Officer Bron Cruz.  *Taylor*, 16 F.4th at 747.  Officer Cruz and two other officers had responded to a call involving a man who had flashed a gun, when they encountered Taylor and two of his companions. *Id*.  The officers ordered the three men to stop and show their hands, and, while the two other men complied, Taylor did not; instead he turned and walked away.  *Id*. Officers followed Taylor with their weapons drawn and repeatedly told Taylor to stop and show his hands, but Taylor refused and began to verbally taunt and challenge the officers, saying things like "What are you going to do?  Come on, …shoot me."  *Id*. at 750. He then walked backwards away from officers and dug his hands into his waistband.  *Id*.  The video from the officer's lapel camera showed Taylor moving his hands in a "digging " motion, like he was manipulating something.  *Id*.  Twice, Officer Cruz told him to "get his hands out," to which Taylor responded, "Nah, fool."  *Id*.  Then, without warning, and as evidenced by the video recording, Taylor rapidly lifted his shirt with one hand and, at the same time, withdrew his right hand from his waistband in a manner that was consistent with the drawing of a gun.  *Id*.  Officer Cruz, who was only 10 to 12 feet from Taylor, immediately

responded by shooting Taylor twice in the chest.  *Id.* at 751-52.  On appeal, the Tenth Circuit determined that Officer Cruz's decision to shoot Taylor under these circumstances was objectively reasonable, given that he was faced with an immediate and a reasonably perceived mortal threat from Taylor.  *Id.* at 763.  Thus, the officer did not violate Taylor's constitutional rights.  *Id.*

The Supreme Court's decision in *City of Tahlequah* involved a situation where two police officers shot and killed the decedent, Mr. Rollice, after being dispatched to Rollice's residence for a domestic disturbance.  595 U.S. at 10.  Police body-camera video captured the officers encountering Rollice outside his garage.  *Id.*  As officers attempted to speak with him, Rollice turned around and walked toward the back of the garage where his tools were kept.  *Id*. The officers ordered Rollice to stop, but he kept walking, grabbed a hammer from the back wall and turned around to face the officers.  He then grasped the handle of the hammer with both hands and pulled it up to shoulder level.  *Id.* at 10-11. The officers backed up, drawing their guns, when Rollice took a few steps to his right and raised the hammer high behind his head as if he was about to threw the hammer or charge the officers.   *Id.* at 11. At that point, two of the officers fired their weapons, killing Rollice.  *Id.*  Before reaching the Supreme Court, the Tenth Circuit Court of Appeals held that the officers' shooting of Rollice was not objectively reasonable, and found a violation of Rollice's constitutional rights.  For its determination, the court relied on circuit precedent that allowed an officer to be held liable for a shooting that is itself objectively reasonable if the officers' reckless or deliberate conduct created a situation requiring deadly force.  *Id.* at 11.  On review of that decision, the Supreme Court reversed, holding that the Tenth Circuit had failed to establish the officers' conduct was unlawful under clearly established law. *See id*. at 12.  The Court did not, however, decide whether the officers violated the Fourth Amendment in the first place.  *See id*. at 11.

*Taylor* and *City of Tahlequah* do not advance Defendant Starr's argument in this case.  In *Taylor*, the facts considered by the court, even viewed in the light most favorable to the plaintiffs, showed that the decedent in that case made a hostile and threatening move by reaching into his waistband, digging around with his hands, and then abruptly pulling his hand out of his waistband as if he was drawing a gun - giving officers only seconds to react to this potentially deadly threat. *Taylor*, 16 F.4th at 750-51.  Moreover, the indisputable evidence from an officer's lapel video showed that Taylor manifested an intention to engage officers by taunting them and daring them to shoot him – escalating the potential threat to the officers as they confronted him from only a few feet away. *See id.* at 750.  As to *City of Tahlequah*, the Court finds that decision inapplicable here because, in that case, the Supreme Court did not reach the issue of whether the officers' actions were or were not objectively reasonable.  See 595 U.S. at 11 ("We need not, and do not, decide whether the officers violated the Fourth Amendment in the first place.").  But even assuming, for the sake of argument, that it had, that case also involved a very different scenario than the one here because there was no dispute that the decedent in that case raised a hammer, a potentially deadly weapon, as if he was about to throw it at the officers who ultimately shot him. *Id*. at 10.

Here, viewing the evidence in the light most favorable to Plaintiff, there is no indication that Plaintiff taunted officers, threatened officers, or manifested any sort of intention to engage officers.  Most importantly, the most distinguishing fact between this case and both *Taylor* and *City of Tahlequah* is that, viewing the evidence in the light most favorable to him, Plaintiff here made no hostile motion which could have been viewed by an objectively reasonable officer as posing an immediate threat to the safety of any of the officers with whom he was interacting.  The Court recognizes that Defendant Starr claims Plaintiff made a hostile motion by reaching for and

grabbing the handle of his gun as if he was going to draw it, and agrees that if that occurred, it may have been reasonable for Defendant Starr to use deadly force to protect the other officers who were closer to Plaintiff.  The Court is also cognizant of the fact that it would not have been necessary for Defendant to wait for Plaintiff to pull his gun out and aim it at officers before firing, given that "officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Saucier v. Katz*, 533 U.S. 194, 205, (2001) (internal citation omitted); *see also Larsen*, 511 F.3d at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action.") (citation omitted).   But, as discussed above, the facts also support Plaintiff's version of events, which is that he never attempted to grab his firearm and made clear he was not going to hurt anyone prior to being shot from long-distance by Defendant Starr. This conflicting version of events, both of which are supported by some evidence, demonstrate the existence of disputed issues of fact that the jury must determine at trial. In short, Defendant has not shown there is a lack of a genuine issue of material fact with regard to the reasonableness of his decision to use deadly force against Plaintiff,  precluding summary judgment on the basis of qualified immunity at this time.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) ("When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'") (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir.1991)).

### c) The constitutional right at issue was clearly established at the time Defendant Starr used deadly force against Plaintiff.

Having found that, even though there are disputed issues of fact, a reasonable jury could determine Defendant Starr used excessive force during this incident and violated Plaintiff's constitutional right to be free from excessive force, the Court must next determine whether that right was so "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). As stated above, this prong of the qualified immunity analysis requires that Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, makes it clear to a reasonable officer that his conduct is unlawful. *See Carabajal*, 847 F.3d at 1210; *see also D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (explaining that it must be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted") (quoting *Saucier*, 533 U.S. at 202). A case does not need to be directly on point for a right to be clearly established; instead all that is required is "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 548 U.S. at 104; *see also Kerns*, 663 F.3d at 1186-87. "[O]fficials can still be on notice that their conduct violates established law even in novel circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As the Tenth Circuit explained, "The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013).

Plaintiff argues that the Tenth Circuit's decision in *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006), clearly establishes "that officers are not entitled to qualified immunity when

an officer unreasonably believes a suspect presents a threat to himself or other persons with a gun and uses deadly force as a result of their unreasonable belief."  Doc. 38 at 30.

In *Walker*, plaintiffs, representatives of the estate of the decedent David Walker, brought suit against the police officers who shot and killed Walker when decedent exited his vehicle after leading police on a car chase, pulled a knife out, and held it to his wrist.  *Walker*, 451 F.3d at 1157-58.  The first officer fired his gun and struck the decedent in the hip, later testifying that he believed Walker had a gun in his hand.  *Id.* at 1158.  The second officer fired two shots, striking Walker in the chest and later testifying that he believed that, after being shot by the first officer, the decedent had swung toward officers in a "classic pistol shooting stance."  *Id.*  After the shooting, it was determined that the decedent only had the knife, not a gun.  *Id.* at 1159.  The Tenth Circuit Court of Appeals affirmed the denial of qualified immunity to the officers, concluding that the plaintiffs' version of the facts supported the district court's determination that Walker's Fourth Amendment right to be free from excessive force had been violated when the officers shot him even though he presented no immediate threat to the safety of officers or others.  *Walker*, 451 F.3d at 1160.[10]

The Court agrees that on March 3, 2020, the law was clearly established that Defendant Starr would violate Plaintiff's constitutional rights if he shot him under the circumstances alleged by Plaintiff.  More specifically, as previously determined in this federal district, the Tenth Circuit's decision in *Zia Trust Co. ex rel. Causey v. Montoya* reaffirmed the long-standing rule that it is

---

[10] Defendant presents no argument that, when viewing the evidence in the light most favorable to Plaintiff, he did not violate clearly established law when he shot Plaintiff.  Instead, Defendant relies solely on his version of events to contend that he is entitled to qualified immunity because, in his view, this case is indistinguishable from *Taylor* and *City of Tahlequah* and in those cases the Tenth Circuit and the Supreme Court found an officer's decision to use deadly force was justified.  Doc. 30 at 10-15.  The Court has already addressed the argument regarding the applicability of these cases to the instant one and finds no need to do so again given that these cases are relevant to the excessive force analysis, not to Plaintiff's assertion that the constitutional right at issue here was clearly established at the time of the incident.

clearly established that an officer may not use deadly force when a suspect does not pose an immediate threat to the officer or to others. 597 F.3d at 1155 (concluding officer violated a suspect's clearly established rights by using deadly force without probable cause that the suspect posed a serious threat of physical harm to the officer or to others); *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009) ("There is no question that the general principle governing the use of force is clearly established: deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others."); *see also Dorato v. Smith*, 108 F.Supp.3d 1064, 1157-58 (D.N.M. 2015). Viewing the evidence in the light most favorable to the nonmoving party, Plaintiff did not reach for a weapon, did not advance on the officers who were attempting to communicate with him, did not attempt to resist arrest, and did not threaten the officers in any way.  Because he posed no immediate threat to the officers he was interacting with or Defendant Starr at the time he was shot, Defendant Starr violated his clearly established Fourth Amendment right to be free from excessive force.

The Court recognizes that, in this case, Plaintiff possessed a gun and the decedent in *Walker* possessed a knife, but does not find that distinction to be significant to the analysis here because the determinative factor in *Walker* was not the type of weapon the decedent possessed, but whether he posed an immediate threat to the officers he encountered.  *Walker,* 451F.3d at 1160.   To be sure, had Plaintiff in this case drawn or even reached for his gun, the danger to officers would have been more pronounced than if Plaintiff pulled out a knife, but taking the Plaintiff's version of events as true, he did not attempt to take the firearm from his waistband and thus posed no threat

at the time he was shot.[11]  Other circuit courts of appeals have agreed that it is clearly established that a law enforcement officer violates the constitution when he or she uses deadly force against an individual who does not pose an immediate threat to officers or others, even if the individual is in possession of a firearm.  *See*, *e.g*., *Cole Est. of Richards v. Hutchins*, 959 F.3d 1127, 1134-35 (8th Cir. 2020) (holding that it was clearly established that an officer cannot use deadly force against a person who does not pose an immediate threat to another "although the person is in possession of a gun, [so long as] he does not point it at another or wield it in an otherwise menacing fashion"); *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("[T]he mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit.  Where the weapon was . . . and what was happening with the weapon are all inquiries crucial to the reasonableness determination."); *Weinmann v. McClone*, 787 F.3d 444, 450-51 (7th Cir. 2015) (holding officers used unconstitutional excessive force when they shot suspect who was passively sitting in chair with gun in his lap where suspect did not threaten officers in any manner); *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (finding it was clearly established that "an officer does not possess the unfettered authority to shoot" someone "because that person is carrying a weapon" unless "based on reasonable assessment, the officer or another person is threatened with the weapon"); *Bennett ex rel. Est. of Bennett v. Murphy*, 120 F. App'x 914, 918

---

[11] To say that Defendant Starr was justified in using deadly force against an individual like Plaintiff, who was not suspected of having committed a crime and did not pose an immediate threat to officers, because he possessed a non-concealed firearm on his person, would run afoul of the principles set forth in the Supreme Court's second amendment jurisprudence.  *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022) (holding that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home"); *see also McDonald v. Chicago*, 561 U.S. 742 (2010);  *District of Columbia v. Heller*, 554 U.S. 570 (2008).

(3d Cir. 2005) (holding that it was "clearly established prior to this incident . . . that under *Graham* and *Garner* law enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed") (internal citation and quotations omitted); *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").

Plaintiff has met his burden of showing that the constitutional right at issue here was clearly established at the time Defendant Starr used deadly force against him.  Given this finding, and the Court's prior determination that there exist unresolved disputes of historical facts relevant to the immunity analysis, Defendant's motion for summary judgment based on qualified immunity as to Plaintiff's § 1983 claim of excessive force is denied.  *See Beauford*, 35 F.4th at 1262.

2. <u>Defendant Starr Is Not Entitled to Qualified Immunity on Plaintiff's Second Claim for Relief in His Complaint.</u>

Defendant Starr next moves for summary judgment on Plaintiff's second claim for relief in his Complaint, which alleges that Defendant violated Plaintiff's constitutional rights when he failed to warn Plaintiff before using deadly force against him.   Doc.1-2, ¶¶ 50-63. In his motion, Defendant asserts that he is entitled to qualified immunity on this claim, stating that, viewing the evidence in his favor, his conduct was reasonable under the circumstances.  Defendant cites to the Supreme Court's decision in *White v. Pauly*, 580 U.S. 73 (2017) and provides three reasons why his motion as to this claim should be granted: 1) "there is no question but that the Plaintiff understood he was dealing with law enforcement officers;" 2) "the deputies had their firearms pointed at the Plaintiff at all times material hereto"; and 3) "Plaintiff himself indicated he understood why the law enforcement officer shot him when he reached for his gun."  Doc. 30 at 16.

The Court finds that Defendant has not sufficiently articulated a basis to grant summary judgment on this claim.  The fact that Plaintiff knew he was dealing with officers and that the deputies had their firearms pointed at Plaintiff during his entire interaction with them is not in dispute and, more importantly, not relevant to whether Defendant is entitled to qualified immunity on Plaintiff's failure to warn claim.  As the court has determined, there are factual disputes regarding whether Plaintiff abruptly reached for and grabbed the handle of his gun or whether he was standing without having reached for his firearm at the time Defendant Starr shot him.  Thus, there are factual disputes regarding whether it was feasible for Defendant Starr to have first warned Plaintiff before using deadly force that must be resolved by a jury.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that at the time Defendant Starr shot Plaintiff, there was no immediate threat to his safety or that of the other officers on the scene and no reason why he could not have called out a pre-shooting warning to Plaintiff.  Given that dispute, as well as the fact that it was clearly established in the Tenth Circuit as of March 3, 2020, that some warning must be given, when feasible, before an officer uses deadly force, Defendant's motion for qualified immunity on this claim must be denied at this time.  *See Samuel v. City of Broken Arrow,* 506 F. App'x 751, 754 (10th Cir. 2012) ("Finally, it is clear that some warning must be given before an officer uses deadly force if feasible.") (internal quotation and citation omitted).

3.  <u>Defendant Starr Is Entitled to Qualified Immunity on Plaintiff's Third Claim for Relief in His Complaint.</u>

Defendant Starr also argues that summary judgment is appropriate on Plaintiff's third claim for relief in his Complaint, which alleges that Defendant violated Plaintiff's constitutional rights when he continued to use deadly force against Plaintiff after Plaintiff was subdued.  Doc.1-2, ¶¶ 64-76.  Defendant argues he is entitled to qualified immunity on this claim because  he fired two

shots in rapid succession, which was like the officer's actions in *Taylor*, and, in that case, there was no determination that the second shot was a use of force on a subdued person.  Doc. 30 at 16. According to Defendant, he is entitled to qualified immunity on this claim because there is no precedent that would have made it clear to him that firing a second follow-up shot violated an individual's rights or clearly established law.  *Id*. at 17.

Plaintiff does not respond to Defendant's qualified immunity argument on his third claim for relief.  Doc. 38.  Once Defendant asserts qualified immunity on a particular constitutional claim, the burden is on Plaintiff to show the violation of a clearly established constitutional right. *See, e.g*., *Cummings*, 913 F.3d at 1239; *Riggins*, 572 F.3d at 1107.  Because Plaintiff does not do so with regard to his third claim for relief, the Court will grant Defendant's request for summary judgment on that claim.

## C. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS.

Finally, Defendant Starr moves for summary judgment on Plaintiff's claims brought under the New Mexico Tort Claims Act, which waives immunity for law enforcement officers acting within the scope of their duties when they commit, among other things, assault and battery. *See* N.M. STAT. ANN. § 41-4-12 (1978).  Defendant acknowledges that law enforcement officers in New Mexico "may be subject to claims for battery in the course of their duties when their force is unlawful and unprivileged," but claims that in this case, under his version of the facts, the use of deadly force against Plaintiff was both lawful and privileged.  Doc. 30 at 17 (quoting *Sanchez v. Baker*, 457 F. Supp. 3d, 1143, 1161-62 (D.N.M. 2020)).  This is so, according to Defendant, because his "use of force was reasonable when compared to the hypothetical officer placed in the same situation." *Id*. at 17-18.

As discussed in Section B(1)(a) above, the Court has determined that there are significant and genuine disputed issues of fact regarding whether Plaintiff made any hostile motions with a weapon towards police officers or took any other action that would have justified the use of deadly force and the battery inflicted upon Plaintiff. Given these disputes, the Court will deny Defendant's motion for summary judgment on Plaintiff's state law claims.

**V.**
**CONCLUSION**

For the foregoing reasons, the Court finds that genuine issues of disputed fact exist that 1) preclude summary judgment on the basis of qualified immunity as to Plaintiff's § 1983 claims for excessive force and failure to warn before using deadly force, and 2) preclude summary judgment on Plaintiff's state law claim for battery. Defendant, however, is entitled to summary judgment on the basis of qualified immunity as to Plaintiff's claim that Defendant used deadly force after he was subdued.


**THEREFORE, IT IS ORDERED** that Defendant's Motion for Summary Judgment Based in Part on Qualified Immunity, Doc. 30, is **GRANTED**, in part, and **DENIED**, in part.

_____

**HON. DAVID HERRERA URIAS**
**UNITED STATES DISTRICT JUDGE**